**DRESSER INDUSTRIES, INC., a corporation, Plaintiff,**

v.

**HERAEUS ENGELHARD VACUUM, INC., a corporation, Defendant.**

Civ. A. No. 64–1205.

United States District Court
W. D. Pennsylvania.

Feb. 13, 1967.

964

Walter T. McGough, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Dean A. Olds and Jerome Gilson, Hume, Groen, Clement & Hume, Chicago, Ill., Robert W. Mayer, Dallas, Tex., for plaintiff.

Ralph D. Dinklage, Burgess, Dinklage & Sprung, New York City, Edward F. Welsh, Pittsburgh, Pa., for defendant.

## OPINION

WILLSON, District Judge.

The plaintiff in this action is Dresser Industries, Inc., a Delaware corporation having its principal place of business at Dallas, Texas. The defendant is Heraeus Engelhard Vacuum, Inc., a Delaware corporation having its principal place of business at Monroeville, Pennsylvania, in this District. In the complaint, plaintiff alleges that this action is brought under the federal trademark statute, 15 U.S.C. §§ 1051–1127, and that the jurisdiction of this Court is based upon 15 U.S.C. § 1121 and 28 U.S.C. § 1338.

Plaintiff, through its Roots-Connersville division, manufactures and sells rotary positive displacement vacuum pumps. Defendant's corporate parent W. C. Heraeus, GmbH, of Hanau, Germany, manufactures in that country similar pumps for which defendant is the marketing agent in the United States. Defendant markets pumps ranging in

price from about $1,300 to $25,000 and up. Competitive bidding accounts for about 30 to 50 percent of the sales in this range, with the percentage of competitive bidding rising as the price increases. The remainder of sales are made as a result of inquiries and orders from prospective buyers. Its buyers include federal departments and agencies, companies in the aerospace, steel, chemical and electrical industries, and universities and laboratories. It advertises its products in selected trade and technical journals. The controversy here is over the use by the defendant of the word ROOTS in advertising the rotary positive displacement vacuum pumps manufactured by W. C. Heraeus. The parties have stipulated that defendant has not affixed the word ROOTS to any of its manufactured products. Nor has defendant affixed the word ROOTS to any of the boxes, containers, or wrappers in which its products are shipped throughout the country.

In the complaint, plaintiff sets forth its allegations under three counts. The first count is styled "Trademark Infringement." Plaintiff alleges that it is the owner of six trademarks, the registrations of which are in full force and effect, and which have been variously and continuously used on the several products manufactured and sold by plaintiff. Plaintiff alleges that the use of the trademarks, both on its goods and in advertising with respect to them, together with "continuous and expensive maintaining of high standards of excellence of products," has resulted in a very favorable consumer identification of the trademarks with it and its products. Plaintiff finally alleges that despite its long-established prior right to the use of the trademarks in connection with a wide variety of products, defendant began in 1963 to use one of the trademarks, the word ROOTS, in connection with the advertisement and sale of blowers and pumps, and that such use wrongfully identifies and represents the defendant's products with and as those of the plaintiff, and does and will cause confusion, deception or mistake, in violation of 15 U.S.C. § 1114(1).

The second count is styled "Federal Unfair Competition." Plaintiff repeats the allegations in the first count and alleges that defendant's use of the word ROOTS with respect to its products constitutes a false designation of origin, in violation of 15 U.S.C. § 1125(a).

The third count is styled "Common Law Unfair Competition." Plaintiff repeats the allegations made in the first and second counts, and alleges that although defendant had knowledge of the prior use of the plaintiff's trademarks, defendant used the word ROOTS in advertising its products, thereby promoting its products in such a manner as to suggest association with plaintiff and to cause confusion, deception or mistake as to the origin of defendant's products, and profiting unlawfully from consequent sales.

Plaintiff seeks both injunctive relief and monetary damages.

In its answer, defendant essentially denies that the designation ROOTS in the form asserted by plaintiff constitutes a trademark, and alleges that any alleged trademark or registration of which ROOTS is all or a significant portion is invalid and unenforceable against defendant in that the word ROOTS is and has been since at least 1900 in the public domain as signifying "an engineering principle and/or an equipment type and/or an equipment type incorporating said principle," or that the designation ROOTS was abandoned as a trademark by plaintiff. Defendant says that its use of the word ROOTS has been merely descriptive of the equipment it makes and that it has been using the word ROOTS in a generic sense and in good faith and it had been so used prior to the later registrations of the word ROOTS as a trademark by the plaintiff. Defendant alleges that the later registrations of the word ROOTS as a trademark by the plaintiff were fraudulently obtained, and that plaintiff has violated the anti-trust laws in that it has interfered in free commerce and competition by seek-

ing to prevent others from using the word ROOTS in connection with fluid handling equipment. Defendant finally alleges that the word ROOTS has become a generic designation for a type of fluid handling equipment and cannot be exclusively appropriated by plaintiff. In its counterclaim, defendant alleges that despite the fact that the word ROOTS has been in the public domain, has come to identify a principle or type of equipment and has become generic with respect to identifying such type of equipment, plaintiff has applied for certain trademark registrations involving use of the word, and that therefore the registrations were "improperly if not fraudulently obtained," and that plaintiff has thereupon unfairly competed with defendant in attempting to restrict the lawful use of the word ROOTS. As relief, defendant seeks the cancellation of plaintiff's registrations of the word ROOTS, assessment of damages suffered by defendant as a result of plaintiff's allegedly fraudulent registration and unfair competition, and punitive damages for violation of the anti-trust laws.

The corporate background of this controversy, as stipulated to by counsel, is important to an understanding of the contentions of both parties. In 1846, Alanson Roots and his sons Philander and Francis founded the Roots Woolen Mill in Connersville, Indiana. For almost three decades the Roots Mill manufactured and sold nationally a variety of cloth products. Between 1854 and 1859, the Roots brothers established, as a sideline to the woolen mill, a separate business under the name of The P. H. & F. M. Roots Company to develop, manufacture and sell rotary air blowers and related products. A patent for a rotary blower was issued to P. H. Roots in 1860 and reissued in 1866. [Appendix "A"]. When the Roots Mill burned to the ground in 1875, the Roots brothers became active solely in The P. H. & F. M. Roots Company. In 1929, The P. H. & F. M. Roots Company, which had previously become a division of The Stacey Engineering Company, was merged with the Connersville Blower Co., and the resulting corporate entity was known as Roots-Connersville-Wilbraham, a division of the International Stacey Corp. In 1934, the assets of Roots-Connersville-Wilbraham were transferred to The Connersville Blower Company, Inc., and its name changed to Roots-Connersville Blower Corp. In 1944, Dresser Industries, Inc., purchased all the stock of International Stacey, acquiring thereby the stock of Roots-Connersville Blower Corp. In 1952, Roots-Connersville Blower Corporation sold all its assets to Dresser, and was then dissolved. Dresser Industries in that year created a division called Roots-Connersville Blower, the name of which was shortened, in 1965, to Roots-Connersville. In this manner, plaintiff became the owner of, inter alia, the patents and trademarks owned by The P. H. & F. M. Roots Company and its successors. Through the years, the product line of Roots-Connersville has been greatly expanded so that it now manufactures all sorts of air and gas handling equipment—pumps, blowers and exhausters based on various engineering principles, gas meters, and accessories—and is now developing electronics instruments.

Meanwhile, the design disclosed by the 1860–66 patent, in the words of defendant's counsel, "took hold the world over." Blowers of this type, manufactured by The P. H. & F. M. Roots Company or its foreign licensees, were exhibited at and won the highest prizes awarded by the International Exhibitions of Paris in 1867, Vienna in 1873 and Philadelphia (United States Centennial) in 1876. The P. H. & F. M. Roots Company catalog of 1878 is replete with testimonials from users and descriptions of use in a variety of installations ranging from forcing blast furnaces through ventilating buildings to powering church organs. That the design principle disclosed in the 1860–66 patent has generated considerable interest in engineering and industrial circles, and has retained its appeal to the present time,

is borne out by the fact that between 1866 and 1965, more than 50 patents have been issued in this country for designs of equipment based on the rotary positive displacement principle disclosed in the original P. H. Roots patent. Perusal of the technical literature and advertising introduced at trial indicate that the diversity of uses of equipment embodying this principle has increased with the advances made by technology in all fields in this century. Since the 1950's, advances in medium- to high-vacuum technology and its applications and a heightened national interest in aerospace research and development have created a demand for large and costly installations for which the rotary positive displacement vacuum pump is eminently suitable. It appears from catalogs introduced into evidence that at least half a dozen major companies now manufacture and sell this type of pump. These pumps, often large and expensive as set forth above often are sold as a result of an inquiry by or a direct order from the prospective user. In these sales, advertising may play a significant role, and in advertising, the descriptive words used are often of paramount importance. Other sales are made as a result of competitive bidding. Many invitations to bid, introduced at trial, indicated that the prospective purchasers, among whom were the National Bureau of Standards, the United States Air Force, Grumman Aircraft Engineering Corporation and the General Electric Company, specified "Roots-type," "Roots," "roots," or "Roots type" pumps. In this context, it is readily seen that it is of considerable commercial importance to plaintiff, on the one hand, to restrict the use of the word ROOTS to its own products, and to the defendant, on the other, to be free to use the word ROOTS with respect to advertising its products.

In 1955, W. C. Heraeus began distributing, in the United States, its vacuum equipment through Consolidated Electrodynamics Corporation (now Consolidated Vacuum Corporation) on an exclusive distributorship basis. Consolidated advertised the Heraeus rotary positive displacement pumps under designations such as "Roots Pumps," "Roots Blowers," and the like. Plaintiff protested such use, contending at first that the word ROOTS had, in industry, come to mean products of Roots-Connersville, and that Consolidated's use of the word in its advertising would be likely to cause confusion. Consolidated deferred to plaintiff's protest, and, as suggested by plaintiff, began advertising the Heraeus rotary positive displacement pumps as "Heraeus Roots Pump" or "Roots Type Pump." Later, after plaintiff had obtained registration of the word ROOTS as a trademark in 1961 it objected to Consolidated's use of the word in any manner in its advertising, whereupon Consolidated discontinued use of the word ROOTS entirely. In 1963, defendant was formed as a subsidiary of W. C. Heraeus, GmbH, and began distributing Heraeus products in this country. In its advertising, defendant referred to Heraeus rotary positive displacement pumps variously as "Heraeus Roots Pumps," "Roots pump," and "Roots blowers." Plaintiff protested against such use, but defendant refused to accede, contending that its use of the word ROOTS was as a generic term designating and identifying an engineering principle or an equipment type. Defendant continued to use the word ROOTS in its advertising and this action ensued. Defendant, in March 1965, some four months after the complaint in this action was filed, discontinued the use of the word ROOTS in its trade journal advertising pending the decision in this action, although it continued the use of the word ROOTS in its catalogs thereafter.

Plaintiff alleges ownership of six trademark registrations and one non-registered design mark involving the use of the word ROOTS [Appendix "B"]. Defendant has not contested whatever right plaintiff may have to its design or word trademark registrations involving ROOTS-CONNERSVILLE. Although these marks are thus not at issue, they

remain pertinent to this action in that they indicate the extent to which plaintiff made use of the word ROOTS in the years following the Roots-Connersville merger in 1929. It is clear that prior to the merger, the P. H. & F. M. Roots Company used the word ROOTS, either in plain Roman or in the design covered by the 1922 registration, alone or with other trademarks, to advertise and identify its products. After the merger, the design ROOTS was used for some time to mark machinery, as the company continued to use up its supply of pre-merger nameplates. The design ROOTS was also used in castings for some of the larger machines, even as late as 1950. However, the post-merger advertising bore the name of the company, with the name being changed in the advertising to reflect the successive corporate changes of the company, and a new logotype appeared. This was the non-registered design mark ROOTS-CONNERSVILLE [Appendix "B", No. 7]; in it the word ROOTS is emphasized over, but is nevertheless joined with, CONNERSVILLE to make the design. This mark was used on far more nameplates than any other trademarks, almost completely replaced the design ROOTS in the company's advertising, and was used as late as 1955. Concurrently, ROOTS-CONNERSVILLE, either in plain Roman or in simple design [Appendix "B", No. 3], with both words being given equal emphasis, was used in advertising and in product marking, the simple design making its appearance late in the 1940's. During this period, the products were referred to in the text of the advertising as "Roots-Connersville" or "R-C," but never as "Roots." In 1955, another ROOTS-CONNERSVILLE design [Appendix "B", No. 2] came into use and was registered, but its use at first was supplementary to rather than exclusive of the earlier marks, which however were discontinued in 1960. In 1961 the word ROOTS in plain Roman was registered; it was at first used with and emphasized over "Connersville," especially in machine marking, but has been used alone in advertising since registration.

Roots-Connersville and its predecessors have, with few exceptions, employed the trademarks described above to designate its entire product line. Defendant, on the other hand, has employed ROOTS only to designate, and in advertising only, W. C. Heraeus rotary positive displacement vacuum pumps. It has been defendant's chief contention that its use of the word ROOTS has been to describe the type of pumps or to refer to the engineering principle involved in their design and construction. Defendant has contended that this type of equipment and this principle have become so widely known to those versed in the art that the word ROOTS has become descriptive or has acquired a generic significance when applied to pumps, and as such cannot be registered as a trademark.

■ The word ROOTS is derived, as has been seen, from plaintiff's predecessor in interest, The P. H. & F. M. Roots Company, which in turn took its name from the Roots brothers who founded it. As ROOTS is thus an ordinary surname, it was incapable of being exclusively appropriated as a trademark at common law. However, by statute, surnames may be accorded registration as trademarks provided certain conditions are met. Thaddeus Davids Co. v. Davids Mfg. Co., 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046. Registration of a surname as a trademark is conditioned upon the mark's becoming distinctive of the applicant's goods in commerce, prima facie evidence of which is—"substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application." 15 U.S.C. § 1052(f). Defendant makes much of the five-year exclusive use condition in attacking the validity of plaintiff's last two registrations, but in view of this Court's findings and decision that the word ROOTS is generic, this contention is not deemed material to the disposition of this action and will not be further considered.

■ Where, during the life of a patent, a name, whether it be arbitrary or that of the inventor, has become the identifying and generic name of the thing patented, this name passes to the public with the expiration of the patent. Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118. However, the mere expiration of the patent covering the thing patented does not cause the name of the thing to pass, along with the teaching of the patent, into the public domain. The test is whether the name of the patented thing has become generic, that is, whether the name of the patented thing has come to mean primarily what kind of thing it is, rather than that it comes from a single source. The test for deciding whether a name has become a generic title of a product is "What do the buyers understand by the word for whose use the parties are contending?" Bayer Co. v. United Drug Co., 2 Cir., 272 F. 505.

■ Before this question can be answered, however, it is necessary first to determine the composition of the class of buyers for whose trade the parties are competing. Plaintiff takes an expansive view of this class, and would include in it all potential customers for its entire product line, which in its specialized way is quite diverse. However, since trademarks have significance only in the context of competition, the class of buyers here must be restricted to include only those for whose business the parties are competing. In determining the composition of this class, it is necessary to consider the end-use of these goods, their price, relevant advertising and media, and actual and attempted sales.

Vacuum pumps are used by companies in the metallurgical aerospace electronics and chemical industries, both in production and in laboratory installations, by federal departments and agencies, and by universities and laboratories. The vacuum pumps manufactured and sold by both plaintiff and defendant range in price from $1,550 to $75,000. However, it is important to note that while vacuum pump units are themselves rather expensive, they are but components of larger and costlier installations. For instance, defendant's president testified that he was personally involved in the sale of space chambers priced at one-and-three-quarter million dollars and an installation at Jet Propulsion Laboratories in Pasadena costing four million dollars.

Defendant's evidence showed that 30 to 50 percent of its sales in the lowest price range were made on the basis of competitive bidding and that the percentage of sales thus made increased with the price of the unit so that all sales in the higher price range, as well as all federal government sales were made on the basis of competitive bidding. The evidence showed that while direct sales in the lower price range were made through the customers' purchasing agents, often men with little technical background, these purchases were nevertheless made on the basis of specifications drafted by the customers' engineers, in the same manner as, although perhaps less formally and extensively than, sales on competitive bidding.

Defendant has advertised its pumps by means of catalogs which were distributed in the usual manner to interested persons or companies active in the fields mentioned above, and by means of advertisements which appeared in such trade or technical publications as "Iron Age," "Metal Progress," "Iron and Steel," "Research/Development," and "Vacuum Technology." Defendant's customers have included United States Steel, Republic Steel, Boeing Aircraft, Lockheed Aircraft, the National Bureau of Standards and Brookhaven Laboratories.

It is clear that the market for which the parties are competing is not of the over-the-counter type, where purchases are made with haste and without reflection. Nor is it a market where the purchasers are ignorant of the characteristics of the goods offered. Instead, the market is seen to be relatively small and selective, where products are sizeable and expensive and their end use is in installations even more sizeable and expen-

sive, and the buyers are possessed of considerable technical knowledge and experience. It is in this context that the question—"What do the buyers understand by the word ROOTS?"—must be decided.

A major part of the evidence is addressed to this question. Both parties offered the testimony of various officers and employees of their respective companies. This testimony was understandably partisan and of but little probative value. Plaintiff also offered, as evidence of consumer identification of the word ROOTS with Roots-Connersville and its products, testimony of three of its customers and statements by twenty-five others of its customers. Considering the selectivity involved in obtaining this evidence, it is of little validity as a poll; and considering the fact that but one of the customers is engaged in the vacuum field, these statements have little weight.

Important evidence on this point was presented by the parties in offering the testimony of academic experts and in offering technical and professional literature, for this tended strongly to show what engineers and other technical people in this field understood the word ROOTS to mean when they encountered it and what the words ROOTS meant when they themselves used it, in the texts and illustrations of patents, in textbooks, in classrooms, in research and reference articles, in handbooks, in writing or responding to competitive bids, in communicating with each other, and in shop talk among themselves. Plaintiff's experts were Richard J. Grosh, Associate Dean of the School of Engineering of Purdue University, and Harold E. Hoelscher, Dean of the School of Engineering of the University of Pittsburgh. Both testified that the words ROOTS meant Roots-Connersville or its products, that "Roots-type" meant—"of the sort manufactured by Roots-Connersville," and that the expressions "Roots pump" or "Roots principle" as applied to pumps or blowers, were misnomers or imprecise uses of words and as such inconsonant with the best engineering practice. Defend-

ant's expert was Ascher H. Shapiro, Ford Professor of Engineering and Head of the Department of Mechanical Engineering at the Massachusetts Institute of Technology. He testified that the word ROOTS, when applied to pumps or blowers, designated pumps or blowers operating according to a certain particular concept or principle. This principle, which Professor Shapiro testified was known throughout the world to those working in the field of air and gas handling as "the Roots principle," was defined by him as—

> "[T]hat of a pair of counter-rotating impellers in a casing which is approximately oval or elliptical shaped. The rotors have a number of lobes on them, usually two, but sometimes three or four. They mesh with each other in such a way as to prevent back leakage.
>
> "And also, as they rotate they encapsulate volumes of air between the lobes and the casing, and transport those volumes from the inlet side to the discharge side so that the general direction of the flow is a cross-flow. That is, crosswise to the axis of the two rotors." Record, p. 361, line 24 to p. 362, line 9.

Professor Shapiro identified the Roots principle, so defined, with the principle disclosed in the 1860–66 P. H. Roots patent and with the principle of operation of the pumps manufactured by W. C. Heraeus and advertised by Heraeus and by defendant as "Roots pumps" or "Heraeus Roots pumps." Professor Shapiro testified that the word ROOTS had acquired such currency among those in the air and gas handling field as descriptive of this principle and of the equipment manufactured according to this principle that it was not necessary to use the suffix "-type" to complete the meaning conveyed by the word ROOTS. Professor Shapiro testified that for some years, from 1950 to 1957, he taught a graduate course at MIT on fluid handling machinery. This course, which was also taught by other MIT faculty members to undergraduates, was designed to give students a familiarity with characteris-

tics of various types of pumps. Professor Shapiro's testimony indicated that he and his associates taught that the word ROOTS signified a specific type of pump and was descriptive of this pump and its underlying principle and that this pump, called the Roots pump, was distinct from any other type of pump and different in its characteristics. Professor Shapiro testified that what he taught in this course was in accord with the general understanding of engineers all over, that is, that a Roots pump was a rotary pump consisting of two counterrotating and intermeshing impellers in a casing, and that such a pump was known as a Roots pump.

Also of great significance in determining what the word ROOTS means to the relevant buyers is the literature offered by both parties. This literature was compendious; it included copies of patents, texts, handbooks, encyclopedias, articles in technical and professional periodicals, reprints of presentations before learned societies, training manuals and specifications accompanying advertisements for bids. Plaintiff's evidence showed that machines designed and constructed on what the defendant has called the Roots principle i. e., the principle disclosed in the 1860–66 P. H. Roots patent, have been quite frequently referred to by terms other than Rootspumps, -blowers, -compressors and the like. Plaintiff's evidence showed these machines identified as "mechanical pumps," "mechanical blowers," and "mechanical boosters," "lobe type pumps," ["-blowers" and "-boosters"], "rotary pumps," ["-blowers" and "-boosters"] "positive displacement pumps," ["-blowers" and "boosters"], et cetera.

Defendant's evidence showed a widespread usage, of long standing, of ROOTS to designate this equipment. Defendant offered the 1916, 1941, 1951 and 1958 editions of the Mechanical Engineers' Handbook [commonly known as "Marks" after its editor]. Marks, characterized by Professor Shapiro as a very well-known handbook used by mechanical engineers of all types and by chemical engineers and aeronautical engineers, and a "best seller" among engineering books, contained numerous references to and discussions of the "Roots pump" and the "Roots blower." The illustrations in Marks labeled "Roots blower" depicted a machine consisting of twin-lobed counterrotating impellers mounted in a casing, the configuration identified by Professor Shapiro as a blower or pump constructed on the "Roots principle" and known as a "Roots blower". Defendant offered copies of several patents, issued between 1915 and 1964 and belonging to various persons and companies, plaintiff and W. C. Heraeus included, which related to improvements on or auxiliary equipment for pumps and blowers. The language of the patents contains references to "Roots" or "Roots type" pumps and blowers and indicates that the teachings of the patents relate to "Roots" or "Roots type" pumps and blowers. In many of these patents, the principle of operation of the pumps and blowers is described in terms essentially identical to those used by Professor Shapiro to describe the "Roots principle", and the figures accompanying the text display a pump or blower whose configuration is identical to that which Professor Shapiro identified as the "Roots" configuration. Defendant offered several reports of the National Advisory Committee for Aeronautics [the predecessor of NASA] dated 1926, 1927, 1932 and 1936, which deal with tests performed upon the "N.A.C.A. Roots type supercharger," the illustration of which shows it to be a machine conforming to the "Roots principle" as defined by Professor Shapiro. Defendant offered numerous texts, handbooks, encyclopedia entries, articles in professional and trade periodicals and monographs published by the American Vacuum Society and others which deal with the "Roots blower," the "Roots booster," and the "Roots pump," and which contain illustrations and textual descriptions making it clear that the authors were speaking of machines conforming to Professor Shapiro's definition of the "Roots pump" and the "Roots

principle." Defendant offered a publication of the Training Section of the Industrial Relations Department of the Aero-Space Division of the Boeing Company entitled "Practical Vacuum System Design." This publication, used in training Boeing personnel in vacuum technology, devotes a section to "Mechanical Booster Pumps" and states: —"The pump most suitable for this use is the Roots type rotary lobe pump. In this type pump * * * two kidney shaped eccentrics are used, so mounted that they interlock to trap a compressible volume of gas * * *. The lobes never touch each other or the casing, * * *." Defendant offered four invitations for bids: the first from the National Bureau of Standards, which stated—"The two stage high capacity unit shall consist of a Roots-type dry blower * * * and a 300 CFM rotary oil sealed piston mechanical high vacuum pump second stage;" the second from Grumman Aircraft Engineering Corporation which calls for "diffusion ejector pumps, roots blowers, or mechanical pumps as appropriate;" the third from NASA which called for "diffusion-ejector pumps, roots blowers, or mechanical pumps as appropriate;" and the fourth from the Arnold Engineering Development Center of the United States Air Force, which calls for "a 6-stage cascade of Roots blowers plus one stage of rotary oil sealed pumps," with a reference to a schematic diagram which shows, next to the label "Roots Blower," the symbol tentatively adopted by the American Vacuum Society to designate pumps operating on what Professor Shapiro described as the "Roots principle."

Defendant offered three examples of the advertising usage of the word ROOTS by plaintiff's own Dresser Vacuum division: the first, an advertisement appearing in the October 1964 issue of "Research/Development" which contained, next to the label "Roots Blowers (by Dresser/Leybold)" a photograph of a machine which appears to be a pump constructed in accordance with what Professor Shapiro called the "Roots princi-

ple," and the second and third, the 1965 and 1966 "Vacuum Technology Buyer's Guide and Directory" which list under the heading "Blowers" the company "Dresser Vacuum" and the specifications "roots type" and under the heading "Blower-Pump Combinations" the company "Dresser Vacuum" and the specifications "Roots type." Defendant offered a reprint of an article from the "1961 Transactions of the Eighth Vacuum Symposium and Second International Congress [1962]," the authors of which are shown to be employees of the Roots-Connersville Blower Division [the predecessor of the Roots-Connersville division of the plaintiff], in which the following appears:—"Roots-type compressors are quite simple. Two figure-eight shaped counterrotating impellers operate within a case. * * *" In this reprint there is an illustration showing a diagram of a pump operating on what Professor Shapiro described as the "Roots principle" and which is labeled "Roots type compressor showing principle of operation." Defendant introduced a copy of a letter from the president of the Roots-Connersville Blower division of plaintiff, dated February 8, 1960 and written to the advertising manager of Consolidated Electrodynamics Corporation, which was at that time distributor for W. C. Heraeus pumps, in which it is stated:—"If it is necessary to refer [in CEC advertising of W. C. Heraeus pumps] to the Roots lobe design this can be further clarified by an indication that the design is of the Roots principle."

It seems to the Court that the letter just quoted coming from plaintiff at a time prior to any lawsuit or dispute between the parties is of the utmost significance. The letter speaks of the Roots lobe design and "that the design is of the Roots principle." Here the word ROOTS is used by a former president of plaintiff in a generic sense. This is the contention made by the defendant in the instant litigation.

It is clear that the weight of the expert and documentary evidence favors defendant in its contention that ROOTS means,

to buyers in the air and gas handling fields, an engineering principle or equipment designed in accordance with that principle. Plaintiff's experts displayed an almost incredible bias, and by their reaction to the documents produced by defendant on their cross-examination exhibited a pedantic attitude which failed however to disguise their closed-mindedness. Plaintiff's documentary evidence is addressed to the proposition that there are other names for this equipment. This proposition may be valid, but it does not answer the question—"What does ROOTS mean to the buyer?"—and so is entitled to little weight.

Defendant's expert, in contrast to plaintiff's experts, was objective in his testimony, which was direct and to the point. He candidly admitted that there were other terms which have been used to designate this particular type of pump, but the total effect of his testimony was that the term ROOTS has a definite meaning when applied to pumps and that the term is descriptive of a type of pump and of the engineering principle followed in its construction, and that the term ROOTS is so understood by engineers and technical persons throughout the world. He testified that this knowledge came not only from his experience in the academic environment, but also from his contact with engineers and technical people in industry and business. The Shapiro testimony is believable and persuasive. It came from an entirely disinterested witness of vast knowledge on the subject. The Shapiro testimony is accepted by the Court as correct in fact.

■ The documentary evidence demonstrates that the word ROOTS has been used for many years to describe this type of pump and its underlying principle in patents, handbooks, texts, reports, articles and monographs; the necessary inference from such use is that the term ROOTS is one which the writers have felt confident would convey a definite meaning to their readers. The invitations to bid demonstrate that buyers in the market for which the parties are competing understand the term ROOTS

to signify what defendant says it does. Plaintiff's own Dresser Vacuum division has used the term "Roots type" in the same manner defendant has, a manner which plaintiff now contends is meaningless. Professor Shapiro's testimony, together with the documentary evidence offered by the defendant, establish the validity of its contention that ROOTS, when used in the context of fluid handling equipment, is a term of generic significance.

■■ The matter of secondary meaning, although distinct from that of genericality, is nevertheless governed by the same considerations. The doctrine of secondary meaning is applied where terms, incapable originally of registration as trademarks in their primary sense because of descriptiveness or genericality, can become registrable by virtue of their having acquired a secondary meaning which designates in the minds of the buyers the source of the goods as well as their type. The question to be answered in this instance is the same as that in the instance of genericality:— "What do the buyers understand by the word for whose use the parties are contending?" The portions of this opinion which discuss the evidence relating to genericality are here apposite, and what was said there is equally applicable here; it is sufficient here to note that plaintiff has not met its burden of establishing a secondary meaning for the term ROOTS.

Plaintiff contends that where a trademark is used on a variety of different products, it cannot become generic as to any one product, even though that one product was subject to patent protection. This contention is supported by decisions in cases where, as in the case at bar, defendant had raised the issue of genericality to overcome plaintiff's allegations of infringement. However, this contention is based on a conclusion which follows accidentally, but not necessarily, from the factual premises of plaintiff's authorities. In Telechron, Inc. v. Telicon Corp., 97 F.Supp. 131 (D.Del.1951), aff'd, 198 F.2d 903, (3d Cir. 1952), de-

974

fendant sought to extend the genericality which TELECHRON allegedly had acquired as a name for a certain type of electric clock (on which plaintiff had had patent protection) to cover plaintiff's entire product line so that defendant's TELICON would not be infringing as applied to radios. The Court of Appeals, however, noted that the record disclosed that "neither during the life of the basic Warren patents nor thereafter did 'Telechron' become the name of any article of commerce." 198 F.2d at 907, and rejected defendant's attempted extension of the *Singer* doctrine. In Enders Razor Co. v. Christy Co., 85 F.2d 195 (6th Cir. 1936), KEEN KUTTER had been used by plaintiff as a trademark for its line of bladed products for some forty years *before* it was issued patents on safety razors which it also marketed under the name KEEN KUTTER. The Court of Appeals rejected the application of the *Singer* doctrine, declaring:

"In addition to the circumstance that 'Keen Kutter' is a trade name constituting part of a trade-mark applied to numerous articles, the name was used many years before the patents were obtained. Under these circumstances, the mark or name does not become public property upon the expiration of the patent rights especially where, as here, the patents did not contribute greatly to the value of the trade mark." 85 F.2d at 198.

█ Thus *Telechron* and *Enders Razor* while containing language favorable to plaintiff's position, are insufficient, on their facts, to dissuade this Court from finding, upon the evidence in this case, that ROOTS is a word of generic significance, merely descriptive of a type of vacuum pump and its underlying principle. The word ROOTS in this context is incapable, under the *Singer* doctrine and under statutory law, of registration as a trademark. This being so, there is no basis for plaintiff's action for trademark infringement as set forth in the first count of the complaint, and as

to such action, the complaint must be dismissed.

At the end of the trial in this case, I came to the conclusion that plaintiff had failed to prove a case on which relief could be granted. Upon due reflection, after consideration of the oral arguments and briefs of counsel, this conclusion is adhered to.

This opinion is regarded as containing the findings of fact and conclusions of law on which the decision is based as permitted in Rule 52. But in summary and for clarity and specificity, the basic conclusions of law should be stated. They are:

█ *1.* The word "Roots" in designation of pumps, blowers, compressors, or the like, incorporating the design or principle referred to in Patent No. 2369 is in the public domain, and the plaintiff does not have any rights of *trade mark* or of *trade name* in said word *per se*. *2.* The word "Roots" is free for use in the trade by defendant in sales promotion when it identifies said equipment provided said word "Roots" is further characterized, or used in an association, to show that it is the product of a specific supplier other than plaintiff's division "Roots Connersville." *3.* The defendant may rightfully use and has so used said word "Roots" in the *publici juris* manner and form and has acted in accordance with this conclusion.

█ Therefore, these conclusions require a further conclusion that there is no infringement as alleged by plaintiff in Count 1 of the complaint. It follows also from the three conclusions just stated that plaintiff has failed to prove a case of federal unfair competition or common law unfair competition. Conclusions *2* and *3* permit defendant to continue to do what it has been doing. The word "Roots" being in the public domain coupled with the method of advertising heretofore practiced by defendant, no confusion results. The complaint must be dismissed.

The allegations of the counterclaim require discussion and decision.

In the counterclaim defendant alleges that the renewal of the registration of trademark number 153,840, and the registrations of trademarks numbers 710,-549 and 724,195 [Appendix "B", Nos. 1, 5 and 6] were falsely and fraudulently obtained by plaintiff and that plaintiff has used these registrations to limit the use of the word ROOTS to itself and thus has interfered, or has conspired with others to interfere with and restrain free commerce and competition. Defendant seeks cancellation of these trademark registrations under 15 U.S.C. § 1119 and damages for false registration under 15 U.S.C. § 1120 and treble damages for monopolizing trade and commerce under 15 U.S.C. §§ 2 and 15.

With respect to the cancellation of registrations, the pertinent statute provides:

"In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, * * * and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119.

This Court has held that "Roots" as applied to rotary positive displacement lobe type pumps is a word of generic significance; hence, insofar as plaintiff's registrations of the word "Roots" as a trademark apply to these pumps, the registrations must be cancelled. "Roots", as applied to the rest of plaintiff's product line, has not acquired generic significance; hence, plaintiff's registration of the word "Roots" as a trademark for these latter products is valid. Specifically, trademark registration 153,840 [Appendix "B", No. 1], which relates to "rotary blowers, gas pumps, water pumps and vacuum pumps," and trademark registration 710,-549 [Appendix "B", No. 5], which relates to "gas pumps, vacuum pumps, blowers, exhausters, and compressors," must be cancelled insofar as they relate to rotary positive displacement lobe-type pumps, blowers and compressors. These

are products in which the parties are in competition; but with respect to plaintiff's other products, the trademarks may stand as presumptively valid, as there is no issue for this Court to adjudicate in that respect. What we have said here applies to trademark registration number 724,195, which is the trademark registration for "rotary positive displacement gas meters," made by plaintiff.

In its counterclaim, defendant also seeks monetary damages for plaintiff's alleged fraudulent procurement of trademark registrations numbers 710,549 and 724,195 [Appendix "B", Nos. 5 and 6] and alleged fraudulent renewal of trademark registration number 153,840 [Appendix "B", No. 1]; and for plaintiff's alleged interference with commerce and trade by using these registrations, once obtained, to prevent defendant from employing the word "Roots" with respect to its goods. Defendant contends that trademark registration number 153,840 had been abandoned before 1962, that plaintiff nevertheless applied for and obtained renewal of its registration, and that plaintiff thereupon relied upon this renewal in applying for the last two registrations.

With respect to defendant's claims for damages arising from plaintiff's alleged fraudulent registration of trademarks and from plaintiff's interference with trade and commerce, it is clear that no claim is made out upon which relief can be granted. There is nothing in the evidence which indicates that plaintiff relied upon trademark registration number 153,840 to prevent defendant or others from the use of the word ROOTS, until after the inception of this suit, when plaintiff began citing it along with the other two registrations in attempting to police its trademarks. In connection with the other two registrations, it is to be noted that the mere assertion of genericality by an infringer does not ipso facto terminate a trademark owner's rights to the mark. Plaintiff has denied from the outset that the word ROOTS is generic; defendant has not shown that this denial was not in

good faith. Nor has defendant shown that plaintiff's attempts to prevent others from using the word ROOTS has been other than a good-faith policing of its trademarks. For these reasons, defendant's counterclaim must be, except with respect to the cancellation of plaintiff's trademark registrations heretofore discussed, dismissed.

It is so ordered.

## APPENDIX "A"

N. PETERS, PHOTO-LITHOGRAPHERS, WASHINGTON, D. C.

*P. H. Roots,*

*Rotary Blower,*

*Nº 30,157.*                    *Patented Sep. 25, 1860.*

*Witnesses:*
Chas. D. Smith
Geo. H. Rothwell.

*Inventor:*
P. H. Roots
By Munn & Co.
atty.

N. PETERS, PHOTO-LITHOGRAPHERS, WASHINGTON, D. C.

# UNITED STATES PATENT OFFICE

P. H. ROOTS, OF CONNERSVILLE, INDIANA.

## BLOWER.

Specification of Letters Patent No. 30,157, dated September 25, 1860.

*To all whom it may concern:*

Be it known that I, P. H. ROOTS, of Connersville, in the county of Fayette and State of Indiana, have invented a new and useful Improvement in Rotary Blowers; and I do hereby declare that the following is a full, clear, and exact description of the same, reference being had to the accompanying drawings, forming a part of this specification in which—

Figure 1, represents a side view, and Fig. 2, a central vertical section.

Similar letters of reference, in each of the several figures, indicate corresponding parts.

The nature of my invention consists in the combination with two pistons which form arcs of circles and each inclose one quarter the circumference of a given circle, of two recesses which form quadrants of true circles, when each of said recesses occupy just one quarter of the circumference of the said given circle, as hereinafter described. By this combination of pistons and recesses constructed as described but four small essential points of contact during the revolution of the pistons are experienced, and therefore at these points, narrow packing strips can availably be employed for rendering the pistons air-tight, during the time that the vacuum is being formed, and these come into play periodically and successively or at the moment when one ceases its contact another supplies its place.

It is a very essential thing to have the points of positive contact located, for the machine when first made, if employed as a rotary pump can be run for some time without packing and when the parts have worn so as not to be sufficiently tight, the points of contact can be restored and the machine rendered as tight, as when first used, and thus the loss and expense attending the construction of new pistons or the bringing of the parts closer together, obviated. In this particular, my machine differs from all others that I am familiar with and especially from David M. Walker's pump, patented in 1835, whereas, with the combination of pistons and recesses constructed as Mr. David M. Walker describes in the patent granted to him in 1835 on a hydrant pump, the points of contact are continually changing, while the piston is making its movement through the curved recess and therefore it is impossible to availably employ strips of packing at any certain points, and this being so his machine certainly could not be used effectively as a blower, it being essentially important in order to have a machine of this character operate effectively for the blowing of air to pack the pistons airtight, for if they are not packed air-tight, the effective action of the air will be lost to a great degree by reason of its escape between the abutments.

To enable others, skilled in the art, to make and use my invention, I will proceed to describe its construction and operation.

A, and B, represent two double acting rotating abutments made alike in all respects.

C, C, are their shafts.

D, D, D, D, are pistons which are all alike.

E, E, E, E, are the recesses which receive the pistons and are all alike.

F, F, is a concave or case extending around so as just to clear the pistons as they revolve.

H, and G, are the induction and discharge openings, both of which may be made of a size adapted to the uses to which the machine is to be applied.

The pistons D, D, D, D, and recesses E, E, E, E, are arcs of circles and have one common radius, which radius is the chord of an arc of one-eighth the circumference of the circle on which they are formed, shown by the dotted circle in Fig. 2.

The abutments A, and B, are made to revolve simultaneously by means of two equal cog wheels J, J, upon the shafts C, C, of the abutments, as seen in Fig. 1. In order to have the parts operate very tightly, as in the case of a blower, suitable metallic or other packing is to be inserted in the piston at the points X, X, said points being the only ones of positive contact which are experienced during the revolution of the abutments.

When very dense fluids are operated, it will be desirable to remove so much of each of the pistons as represented in red at K, as will allow the free escape of the fluids as the pistons enter the recesses. The same arrangement will be useful for high velocities, when the fluids are not very dense, for when a dense fluid is suddenly forced out of the recess, a concussion is the result similar to striking upon a solid substance, whereas by allowing a sufficient outlet, all such concussion is avoided, and the fluid escapes at such reduced velocity through the enlarged opening, that the operation is easy.

If, as a blower machine of operating size is run at a velocity of 300 or 400 revolutions per minute, a distinct sound can be heard as the air is forced from the recesses, in a blower, it will therefore be useful, as considerable motive power would be saved thereby.

The operation is as follows: When the pistons are made to revolve in the direction of the arrows, the air or water or whatever fluid is acted upon, will be carried forward as the pistons approach together, and is forced through the discharge pipe G, and as the pistons fill the recesses there can be no backward escapement. In this manner, the device will act as a blower or pump.

It is evident that by reversing the operation and acting upon the pistons by steam or water, the device becomes a rotary steam engine or a pressure water wheel.

As the peripheries of all the internal parts are in perfect circles, either convex or concave, it will be comparatively easy to construct them with accuracy.

What I claim as my invention, and desire to secure by Letters Patent, is—

The combination of the pistons D, D, and recesses E, E, when so constructed as to present but four essential points, of positive contact as described and for the purposes set forth.

P. H. ROOTS.

Witnesses:
C. B. EDWARDS,
SAML. ENYANT.

*P. H. Roots,*

*Rotary Blower,*

*Nº 2,369.*                    *Reissued Oct. 2 1866.*

*Witnesses:*

*Inventor:*
P. H. Roots
by
Attorneys

*P. H. Roots,*

*Rotary Blower,*

Nº 2,369.

Reissued Oct. 2, 1866.

Witnesses:
Chas. D. Smith
Geo. H. Rothwell.

Inventor:
P. H. Roots
By Munn & Co.
Attys.

# UNITED STATES PATENT OFFICE

P. H. ROOTS, OF CONNERSVILLE, INDIANA.

## IMPROVEMENT IN BLOWERS.

Specification forming part of Letters Patent No. 30,157,
dated September 25, 1860; Reissue No. 2,369,
dated October 2, 1866.

*To all whom it may concern:*

Be it known that I, P. H. ROOTS, of Connersville, in the county of Fayette and State of Indiana, have invented a new and useful Improvement in Rotary Blowers; and I do hereby declare that the following is a full, clear, and exact description of the same, sufficient to enable any one skilled in the art to which my invention appertains to make and use the same, reference being had to the accompanying drawings, forming a part of this specification, in which—

Figure 1 represents a side view, and Fig. 2 a central vertical section. Figs. 3, 4, and 5 are diagrams illustrating the construction and operation of the apparatus, with three or four pistons and a corresponding number of recesses on each abutment.

Similar letters of reference in each of the several figures indicate corresponding parts.

The subject of my invention is a rotary-blower pump or engine consisting of coacting rotary abutments, each provided with two or more pistons and a corresponding number of recesses, which pistons and recesses constitute, respectively, convex and concave arcs of equal radius, as will be hereinafter described.

To illustrate my invention, I will first describe it as represented in Figs. 1 and 2, where each rotary abutment consists of two pistons, which form arcs of circles, and each inclose one-quarter the circumference of a given circle, and of two recesses, which form arcs of equal radius with the pistons, and also occupy each one-quarter of the circumference of the said given circle. By this combination of pistons and recesses, constructed as described, but four small essential points of contact during the revolution of the pistons are experienced, and therefore at these points narrow packing-strips can availably be employed for rendering the pistons air-tight during the time that the vacuum is being formed, and these come into play periodically and successively, or at the moment when one ceases its contact another supplies its place.

It is a very essential thing to have the points of positive contact located, for the machine when first made, if employed as a rotary pump, can be run for some time without packing, and when the parts have worn so as not to be sufficiently tight the points of contact can be restored and the machine rendered air-tight, as when first used, and thus the loss and expense attending the construction of new pistons or the bringing of the parts closer together obviated. In this particular my machine differs from all others that I am familiar with, and especially from David M. Walker's pump, patented in 1835, whereas, with the combination of pistons and recesses constructed as Mr. David M. Walker describes in the patent granted to him in 1835 on a hydrant-pump the points of contact are continually changing while the piston is making its movement through the curved recess, and therefore it is impossible to availably employ strips

of packing at any certain points; and this being so, his machine certainly could not be used effectively as a blower, it being essentially important, in order to have a machine of this character operate effectively for the blowing of air, to pack the pistons air-tight, for if they are not packed air-tight the effective action of the air will be lost to a great degree by reason of its escape between the abutments.

In Figs. 1 and 2, A and B represent two double-acting rotating abutments, made alike in all respects. C C are their shafts. D D D D are pistons which are all alike. E E E E are the recesses which receive the pistons, and are all alike. F F is a concave or case extending around so as just to clear the pistons as they revolve. H and G are the induction and discharge openings, both of which may be made of a size adapted to the uses to which the machine is to be applied.

The pistons D D D D and recesses E E E E are arcs of circles, and have one common radius, which radius is the chord of an arc of one-eighth the circumference of the circle on which they are formed. (Shown by the dotted circle in Fig. 2.)

The abutments A and B are made to revolve simultaneously by means of two equal cogwheels, J J, upon the shafts C C of the abutments, as seen in Fig. 1.

In order to have the parts operate very tightly, as in the case of a blower, suitable metallic or other packing is to be inserted in the piston at the points X X, said points being the only ones of positive contact which are experienced during the revolution of the abutments. When very dense fluids are operated it will be desirable to remove so much of each of the pistons, as represented in red at K, as will allow the free escape of the fluids as the pistons enter the recesses. The same arrangement will be useful for high velocities, when the fluids are not very dense; for when a dense fluid is suddenly forced out of the recess a concussion is the result, similar to striking upon a solid substance, whereas, by al-

lowing a sufficient outlet, all such concussion is avoided, and the fluid escapes at such reduced velocity through the enlarged opening that the operation is easy.

If, as a blower, a machine of operating size is run at a velocity of three hundred or four hundred revolutions per minute, a distinct sound can be heard as the air is forced from the recesses in a blower; it will, therefore, be useful, as considerable motive power would be saved thereby.

Figs. 3 and 4 illustrate the mode of forming the abutments with more than two pistons and two recesses each. If, instead of taking the chord of an eighth part of the circle as the radius, as shown in Figs. 1 and 2, the chord of the twelfth part be taken as the radius with which to describe the arcs of the pistons and recesses, an abutment with three pistons and three recesses will be produced, as illustrated in Fig. 3, the centers for describing both being, as before, in the circumference of the circles. Again, if the chord of one-sixteenth part of the circle be taken as the radius for describing the pistons and recesses, their centers being, as before, in the peripheries of the circles, then abutments are formed, each having four pistons and four recesses, as shown in Figs. 4 and 5. The principle of the pistons entering and passing the recesses is the same in all these cases.

Fig. 5 illustrates, at x x, the passing of the points of positive contact, at which points the packing may be applied, as before explained. In Figs. 1 and 2 there are four such points of contact; in Fig. 3, six, and, in Figs. 4 and 5, eight.

The operation is as follows: When the pistons are made to revolve in the direction of the arrows the air or water, or whatever fluid is acted upon, will be carried forward as the pistons approach together, and is forced through the discharge-pipe G; and, as the pistons fill the recesses, there can be no backward escapement. In this manner the device will act as a blower or pump.

It is evident that by reversing the operation and acting upon the pistons by steam or water the device becomes a

rotary steam-engine or a pressure water-wheel.

As the peripheries of all the internal parts are in perfect circles, either convex or concave, it will be comparatively easy to construct them with accuracy.

Having thus described my invention, what I claim as new, and desire to secure by Letters Patent, is—

The coacting rotary abutments A B, each consisting of two or more pistons, D D, and two or more recesses, E E, which are arcs of true circles and formed with equal radii, substantially as set forth.

To the above specification of my improved blower I have signed my hand this 12th day of September, 1866.

P. H. ROOTS.

Witnesses:

GEO. W. ROTHWELL,
JAS. L. EWIN.

## APPENDIX "B"

### TRADEMARKS OF ROOTS-CONNERSVILLE AND PREDECESSORS

| Mark | Number | Date of Issue | First Use | Last Use |
|------|--------|---------------|-----------|----------|
| **REGISTERED** | | | | |
| 1. ROOTS | 153,840 | Mar. 28, 1922<br>Reissue 1942<br>Reissue 1962 | 1859 | 1950 |
| 2. ROOTS RC SINCE 1854 CONNERSVILLE | 617,425 | Dec. 13, 1955 | 1955 | current |
| 3. ROOTS-CONNERSVILLE | 632,648 | Aug. 14, 1956 | 1947 | 1960 |
| 4. ROOTS-CONNERSVILLE | 665,972 | Aug. 19, 1958 | 1935 | 1960 |
| 5. ROOTS | 710,549 | Jan. 31, 1961 | 1960 | current |
| 6. ROOTS | 724,195 | Nov. 21, 1961 | 1960 | current |
| **NON-REGISTERED** | | | | |
| 7. Roots CONNERSVILLE SINCE 1854 | | | 1935 | 1955 |