**L.F. GAUBERT & CO., INC., et al.**

v.

**The INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS, INC.**

Civ. A. No. 83–442.

United States District Court, E.D. Louisiana.

April 22, 1983.

Earl S. Eichin, Jr. and John F. Whitney, New Orleans, La., D. Arlon Groves, Houston, Tex., Charles K. Reasonover, Timothy Roniger, New Orleans, La., for plaintiffs.

Jonathan McCall, New Orleans, La., Philip J. McCabe, New York City, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

In this matter the plaintiffs seek to enjoin the defendant from using a certain designation in a forthcoming publication on the basis that such use would constitute an infringement of plaintiffs' trademark rights, unfair competition, and a deceptive trade practice. An evidentiary hearing on the plaintiffs' motion for a preliminary injunction was held on March 31 and April 1, 1983. As expressed in my remarks from the bench at the close of the plaintiffs' case, I am of the opinion that the plaintiffs have not established that they are entitled to preliminary injunctive relief. The factual and legal bases for this opinion are expressed below. To the extent that any of the following findings of fact constitute conclusions of law, they are so adopted. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

*Findings of Fact*

1. The Institute of Electrical and Electronics Engineers, Inc. (IEEE), is a not-for-profit New York corporation, which functions essentially as a professional association. It sells no products, nor endorses the products of others. The IEEE, however, does issue a wide variety of publications in the field of electrical and electronic engineering. At issue in this suit is the publication of one such document, the *IEEE Recommended Practice for Electrical Installations on Shipboard* (the IEEE–45), a standards manual for shipboard electrical installations, portions of which the Coast Guard has adopted as the standard for acceptable electrical installations on commercial vessels.

2. Chapter eighteen of the IEEE–45 deals with recommended construction for shipboard electrical cables, and sets forth proper structure and composition for the various elements of marine cable. Since 1948, chapter eighteen has included a letter code designation system in which individual letters describe elements of the cable. This permits identification of various cable types. The code utilizes individual letters or letter combinations in each of four positions to identify various elements of the cable. The letter or letters in the first position are used to designate the number of conductors in the cable. (*E.g.*, S = single, D = double, T = triple, etc.) The letter or letters in the second position designate the insulation material that surrounds the conductors. (*E.g.*, R = rubber, V = varnished cambric, AV = asbestos-varnished-cambric.) The letter or letters in the

third position indicate the type of jacket that is used to surround the insulated conductors. (*E.g.*, I = impervious jacket.) Finally, if the jacket is covered by a braided metal armor, a letter is placed in the fourth position to indicate the type of armor. (*E.g.*, A = aluminum, B = bronze, C = copper.) Thus, by reference to a legend in chapter eighteen which sets forth the meaning of the letters in the system, one could ascertain that the designation "DRIA" describes a cable constructed as follows: D̲ouble conductor, R̲ubber insulation, I̲mpervious jacket, and A̲luminum armor.

3. The IEEE–45 has been updated approximately every five years. The designation system described above has remained essentially the same since 1948, though the individual letters used to identify various components have been added or deleted as technology changes. For example, the 1967 edition of the IEEE–45 added the letter "S" as a new insulation designation for silicone, which was adapted to use as insulation in commercial shipboard cables.

4. Other cable designation systems exist in other publications that deal with the marine cable industry in particular or the electrical industry in general.

5. The plaintiffs, Lloyd F. Gaubert, Lloyd F. Gaubert & Co., Inc. (LFGC), and Marine Industrial Cable Corp. (Marine), are engaged in the construction and sale of commercial marine shipboard electrical cable. Mr. Gaubert is a part owner and president of both of the Louisiana corporate plaintiffs. Marine constructs cable, all of which is sold to LFGC, a sales or distribution company.

6. Beginning sometime in 1968, in response to a customer's need, the plaintiffs began research and development on the use of the polymer cross-linked polyethylene as insulation in shipboard cables. Plaintiffs' first cable sample utilizing this new insulation was cut on September 3, 1970. While plaintiffs claim to be the first to have adapted the use of such insulation to shipboard cables, it appears that in the early 1970's at least one other cable producer was using such insulation also. See exhibit SX1B.

7. Plaintiffs sought to name the product they had produced and, according to Mr. Gaubert, decided to use as a title the "crossing" nature of the polymer. Mr. Gaubert explained that the idea came from the fact that crossing can be indicated by an "X" as is often done on street signs, such as, "Pedestrian X-ing." The sample cut on September 3, 1970, a three conductor, aluminum armored cable, was thus named "TXIA." This designation was stamped on the cable samples.

8. In 1970 plaintiffs were familiar with the IEEE–45 designation system then in use, *i.e.*, the 1967 edition of the IEEE–45. That edition did not utilize the letter "X" to designate any cable components. Plaintiffs, through Mr. Gaubert and their engineer, Mr. Popoff, contend that no other publications in use in 1970 utilized the *single* letter "X" to indicate cross-linked polyethylene. On cross-examination, however, it was disclosed that the letter "X" was used by others in the designation of products that contained cross-linked polyethylene. For example, the 1968 National Electric Code designated a cross-linked polyethylene insulated cable as "XHHW," in which the "HH" designated certain heat characteristics of the cable, the "W" designated the water resistance of the cable, and the "X," at least in that designation, indicated the cross-linked polyethylene insulation. Also, the polymer was called "XLPE" and "XLP" by plaintiffs' supplier and others in the industry. Accordingly, I find that at the time plaintiffs were developing their product, the letter "X" was being used in the industry to designate cross-linked polyethylene.

9. Plaintiffs have used the following designations in connection with various of their cable products: "SXIA," "SXIB," "DXIA," "DXIB," "TXIA," "TXIB," "FXIA," "FXIB," "MXIA," and "MXIB." These marks were used in the following ways. The original cable sample cut in September of 1970 was marked "TXIA" and sent to plaintiffs' salesmen in late 1970 for display to customers. In the latter part

of 1971 a brochure was printed using these designations and the designations were included in the plaintiffs' catalogue published in 1976. The marks are, also, on the reels on which the cable is sold. Beginning in 1974, plaintiffs' displays at various trade-shows have utilized some of the marks. Finally, the marks have been used in a promotional film made by the plaintiffs in 1974. Plaintiffs' accounting methods, however, do not permit calculation of how much advertising money has been spent in connection with the products bearing the marks in question. Also, plaintiffs' first public use of each of the marks was not the subject of exact proof. Plaintiffs' internal work order files were offered as approximations. They showed dates ranging from 1972 for some marks to 1982 for others. Plaintiffs' Exhibits 32–37. Three of plaintiffs' customers testified that in 1970 the designations in question meant nothing to them but that they later became familiar with them through the use of plaintiffs' products.

10. Plaintiff Gaubert is now the holder by assignment of a United States Patent and Trademark Office registration of the mark "TXIA," issued November 29, 1977. All of the marks in question were also registered with the Louisiana Secretary of State in 1976 and 1979. Plaintiffs' Exhibits 2–5H. (The first use dates stated on the registrations were not, in all cases, substantiated.) It appears, however, that prior to the issuance of all such registrations the plaintiffs, in certain of their advertisements, catalogues, and communications or announcements to the industry, represented that such marks were registered trademarks and, in fact, used the traditional trademark symbol. See exhibits A1, A1B, A2, DX–M, and Plaintiffs' 15 and 77.

11. The 1977 edition of the IEEE–45 included for the first time specifications for shipboard cable utilizing cross-linked polyethylene insulation. This edition also added the letter "X" to the designation system to signify cable containing cross-linked polyethylene insulation. Those specifications, however, were, in the plaintiffs' opinion, significantly different from the specifications they had developed for their product.

Nevertheless, plaintiffs did enter into discussions with the defendants regarding what the plaintiffs considered an infringement of their trademarks.

12. The matter has apparently not been resolved as the publication of the 1983 edition of the IEEE–45 is now pending. In this edition defendants intend to continue their use of the "X" designation for cross-linked polyethylene insulation. This edition would also modify the specifications for such cable. Mr. Popoff characterizes the new specifications as "identical" to those of plaintiffs. On cross-examination, however, use of the same sample bid request utilized by Mr. Popoff to compare the defendant's 1977 specifications with the plaintiffs' specifications revealed that the 1983 IEEE–45 specifications will still contain a rather substantial difference from plaintiffs' specifications, at least with regard to weight. The IEEE–45 would also recommend that a marker tape be included in all cable manufactured to its specifications that would state the manufacturer of the cable as well as the IEEE–45 designation.

*Conclusions of Law*

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338.

2. In order to be entitled to a preliminary injunction a movant must carry the burden of persuasion on each of the following prerequisites to such relief: "(1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest." *The Vision Center v. Opticks, Inc.,* 596 F.2d 111, 114 (5th Cir.1979), *cert. denied,* 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980).

3. Regarding the merits of plaintiffs' federal and state law claims, I note that except for specific areas of divergence

which are outlined below, federal precedents have been recognized "as announcing generally accepted principles of substantive trademark law." *Vision Center,* 596 F.2d at 115 (citing *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 113 n. 1, 59 S.Ct. 109, 111 n. 1, 83 L.Ed. 73 (1938)).

4. The likelihood of plaintiffs' success on the merits of the federal and state trademark infringement causes of action depends on the threshold issue of whether the mark is registrable or protectable. *Vision Center,* 596 F.2d at 115. The registration of marks under federal or state law provides the holder only with a procedural advantage. Such registration constitutes prima facie evidence of the registrability of the mark, but does not prevent a defendant in an action such as this from proving defenses. 15 U.S.C. § 1115(a); *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1184 (5th Cir.1980); *Givens Jewelers, Inc. v. Givens,* 380 So.2d 1227, 1231 (La.App. 3rd Cir.), *writ denied,* 383 So.2d 800 (La.1980).

5. In analyzing potential trademarks, courts have established the following classification scheme: (1) generic marks (2) merely descriptive marks (3) suggestive marks and (4) arbitrary or fanciful marks. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 790 (5th Cir.1983); *Soweco,* 617 F.2d at 1183; *Vision Center,* 596 F.2d at 115. While generic terms are never subject to trademark protection, merely descriptive terms are not ordinarily protectable as trademarks, 15 U.S.C. § 1052(e)(1); La.Rev.Stat.Ann. § 51:212(5)(1) (West Supp.1983), but may attain such status if they acquire a secondary meaning in the minds of the consuming public. *Zatarains,* 698 F.2d at 790. The third and fourth category are subject to protection without the need for proof of secondary meaning. *Id.* at 791.

6. In order to establish secondary meaning for a term, the plaintiff "must show that the primary significance of the term in the minds of the public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59

S.Ct. 109, 113, 83 L.Ed. 73 (1938). The Fifth Circuit has characterized the burden as a difficult one requiring a "high degree of proof." *Zatarains,* 698 F.2d at 791; *Vision Center,* 596 F.2d at 118. While noting that absent a consumer survey, the matter is not subject to direct proof, the Fifth Circuit has explained that in evaluating evidence such as a plaintiff's advertising expenditures "it must be remembered that the question is not the *extent* of promotional efforts, but their *effectiveness* in altering" the meaning of the mark to the consuming public. *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 850 (5th Cir.1970) (emphasis in original).

7. I find that the symbol "X" used to indicate cross-linked polyethylene was, in the relevant market, merely descriptive of a component of the plaintiffs' product. In fact, plaintiffs used the mark in a pre-existing system established for the specific purpose of standardized cable component description. The Fifth Circuit has indicated four possible tests of descriptiveness: (1) dictionary meaning, (2) imagination test, (3) whether competitors would be likely to need the term in describing their products, and (4) whether others actually used the term in marketing similar products. *Zatarains,* 698 F.2d at 792–93. The third and fourth tests clearly support the descriptive conclusion. In an industry that as a long-standing practice uses single letters to describe certain cable components, "X" is a likely choice for description of a cross-linked polyethylene insulation. In 1970, others, including the National Electric Code and plaintiffs' supplier, were using "X" to describe such insulation. While some of plaintiffs' customers testified that the symbol meant nothing to them in 1970, thus in some sense indicating that the term did not merely describe characteristics of the product but rather required some imagination, such statements are untenable in light of the existing use of the symbol at that time.

This conclusion is bolstered by the number of instances in which other courts have held that letter or number combinations are

merely descriptive. *See, e.g., Walt-West Enterprises v. Gannett Co.,* 695 F.2d 1050 (7th Cir.1982) (FM107 is descriptive for a radio station); *CPP Insurance Co. v. General Motors Corp.,* 212 U.S.P.Q. 257 (C.D.Cal. 1980) ("CPP" descriptive of a consumer protection plan); *Textron, Inc. v. Omark Industries, Inc.,* 208 U.S.P.Q. 524 (series of six different numbers not protectable as a code for describing physical characteristics of product); *Nature's Bounty, Inc. v. Basic Organics,* 432 F.Supp. 546 (E.D.N.Y.1977) ("B–100" descriptive of a 100 milligram B–12 vitamin tablet); *Southwire Co. v. Kaiser Aluminum & Chemical Co.,* 196 U.S.P.Q. 566 (T.T.A.B.1977) ("ALR" was descriptive of conductor wire); *Programmed Tax Systems, Inc. v. Raytheon Co.,* 419 F.Supp. 1251 (S.D.N.Y.1976) ("PTS" descriptive of a programmed tax system).

8. Plaintiffs have not carried the burden of proving secondary meaning. While plaintiffs no doubt invested significant sums in advertising their products, such proof alone does not meet the burden. *Aloe Creme,* 423 F.2d at 850. The testimony of plaintiffs' customers, far from proving secondary meaning, simply establishes that they first became acquainted with X-type cable by use of the plaintiffs' products. Their testimony does not establish that the primary significance of the mark "X" is not the product but the producer. *Kellogg Co.,* 305 U.S. at 118, 59 S.Ct. at 113.

9. Therefore, plaintiffs' marks are not subject to trademark protection and thus plaintiffs are not likely to prevail on the merits of their infringement claims.

10. For essentially the same reasons expressed above, plaintiffs are not likely to succeed on the merits of their unfair competition claims. Having failed to establish that the mark in question is associated in the public mind with the plaintiffs, there is no likelihood of confusion by the defendant's use of the mark sufficient to establish a Lanham Act section 43(a) claim. 15 U.S.C. § 1125(a); *Robert B. Vance & Associates v. The Baronet Corp.,* 487 F.Supp. 790, 797 (N.D.Ga.1979); *Rolls-Royce Motors Ltd. v. A & A Fiberglass Inc.,*

428 F.Supp. 689, 697 (N.D.Ga.1976). It should be noted that in addition to recommending the use of the symbols in question, the defendant's publication also recommends that the manufacturer be identified on the cable. This negates any inference of passing off. *Schmid Laboratories v. Youngs Drug Products Corp.,* 482 F.Supp. 14, 22 (D.N.J.1979). Under Louisiana law of Unfair Competition in order to obtain injunctive relief a plaintiff must prove fraud or an intent to pass off the defendant's product as that of the plaintiff. *Vision Center,* 596 F.2d at 118 (citing *Home Beverage Service v. Baas,* 210 La. 873, 28 So.2d 481, 484 (1946)). Here, defendant has merely sought to use the mark to describe a cable component manufactured to its specifications. No fraudulent intent is present.

11. Similarly, plaintiffs' claim of a deceptive trade practice under La.Rev.Stat. Ann. §§ 51:1401–1408 (West Supp.1983), for misuse of their alleged trademarks must also fail if the marks are held invalid.

12. Finally, I find that plaintiffs, whether intentionally or through careless disregard for the significance of such actions, misused the encircled "R" symbolic of trademark registration and thus are precluded from obtaining the equitable remedy of injunctive relief under the unclean hands doctrine. *Urecal Corp. v. Masters,* 195 U.S. P.Q. 94 (N.D.Ill.1976); *Fox-Stanley Photo Products, Inc. v. Otaguro,* 174 U.S.P.Q. 257 (D.Mass.1972).

13. The motion for preliminary injunction is denied, plaintiffs having failed to prove the likelihood of success on the merits necessary to obtain preliminary injunctive relief.