**A.J. CANFIELD COMPANY**

v.

**CONCORD BEVERAGE COMPANY.**

Civ. A. No. 85–5085.

United States District Court,
E.D. Pennsylvania.

Dec. 23, 1985.

Richard H. Compere, Chicago, Ill., for plaintiff.

Arthur H. Seidel, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCIRICA, District Judge.

Subsequent to filing a complaint for federal and common law unfair competition, plaintiff petitioned for a preliminary injunction forbidding use of the designation "Chocolate Fudge" in connection with the defendant's diet chocolate fudge soda. At a hearing on the motion, each side presented testimony and expert evidence. On the basis of the following findings of fact and conclusions of law, I conclude that plaintiff's motion should be denied.

## I. FINDINGS OF FACT

1. Plaintiff, A.J. Canfield Company ("Canfield"), is a corporation having its principal place of business in Chicago, Illinois.

2. Defendant, Concord Beverage Company ("Concord"), is a Pennsylvania corporation having its principal office in Concordville, Pennsylvania.

3. Plaintiff has been in business since 1924 and, as a well-established major Chicago bottler which makes and sells soft drinks in the mid-west, has a six (6%) or seven (7%) percent share of the Chicago soft drink market, in which both national and local "private label" companies compete.

4. Defendant manufactures, bottles and sells soft drinks under the house mark "Vintage" in Pennsylvania, New Jersey, and New York.

5. Plaintiff produces a line of sugar-sweetened and artificially sweetened "diet" sodas. The diet line includes nine different flavors.

6. In the early 1970s plaintiff began marketing a low-calorie chocolate soda, which is artificially sweetened and flavored.

7. At approximately that time, plaintiff also began using the designation "chocolate fudge" for this new product.

8. From 1973 to 1984, plaintiff's annual sales of diet chocolate fudge soda fluctuated from a high in 1973 of 347,000 cases to a low in 1979 of 19,000. In 1984, plaintiff sold 51,000 cases.

9. The market for soft drinks is unstable; it can fluctuate significantly.

10. During the period 1973 to 1984, plaintiff after an initial expenditure in 1973 of approximately $250,000 for advertising, spent an annual average of $100,000 pro-

moting its entire line of diet soda, which included chocolate fudge soda.

11. During this period, plaintiff also received some publicity about its diet chocolate fudge soda from a *Chicago Tribune* article that traced the drink's development.

12. In 1984, plaintiff switched its entire line of diet soda to 100% Nutra-Sweet sweetener and spent nearly $400,000 advertising these diet sodas.

13. Through the first nine months of 1985, plaintiff spent approximately $305,-000 advertising diet chocolate fudge soda.

14. Plaintiff has employed a public relations firm since 1982 or 1983 and has established promotions that include bumper stickers and beach towels.

15. Prior to January 13, 1985, plaintiff's soda line, including diet chocolate fudge soda, was sold primarily in Illinois, Indiana, Michigan and Wisconsin.

16. On January 13, 1985, the *Chicago Tribune* carried a column written by Bob Greene concerning plaintiff's diet chocolate fudge soda. Greene compared plaintiff's diet chocolate fudge soda to a hot fudge sundae and described how it had helped him maintain his diet by satisfying his desire for chocolate.

17. As a result of Bob Greene's column, which is syndicated and appears in at least 80 newspapers, a tremendous demand was created for plaintiff's diet chocolate fudge soda. Approximately 1.6 million cases of plaintiff's diet chocolate fudge soda were sold in the first seven months of 1985. Another 2.1 million cases were produced by plaintiff's licensees. Initially, plaintiff was unable to satisfy the demand for the soda, especially in areas outside of the mid-west where the product had never been sold.

18. Following the appearance of Bob Greene's column, stories on plaintiff's diet chocolate fudge soda were featured in various print media (*e.g.*, *The New York Times, Time Magazine, The Philadelphia Daily News, The Washington Post, People Magazine*) and on various television shows (*e.g.*, "*CNN News Broadcast*," "*CBS Morning News*," "*Good Morning America*," "*PM Magazine*".)

19. Following the appearance of Bob Greene's column, many bottling companies sought licenses for plaintiff's diet chocolate fudge concentrate.

20. Among those interested in obtaining a license for plaintiff's product was defendant's president, Harold Honickman, who contacted plaintiff's president in approximately February 1985.

21. At that time, Mr. Honickman informed plaintiff's president that his company wanted to sell diet chocolate fudge soda, for which he had already received a large order, and he requested a license.

22. There was a second telephone conversation between Mr. Honickman and plaintiff's president, but defendant received neither a licensing or franchise agreement. Defendant then prepared its own diet chocolate soda, which it also called diet "chocolate fudge" soda.

23. Plaintiff eventually granted eleven U.S. licenses to companies other than defendant.

24. Defendant's familiarity with plaintiff's product and his two attempts at procuring a license indicate that defendant intended to and did copy plaintiff's designation.

25. In the late winter and spring of 1985, plaintiff granted licensing agreements for at least a portion of the area in which defendant distributed its soda products. These licensing agreements cover diet chocolate fudge soda and plaintiff's other products.

26. For the first two months each licensee was granted an advertising allowance of 20¢ per case, to be used as the licensee saw fit. Although plaintiff also supplied the licensees with advertising material, plaintiff has "no knowledge of the advertising or promotion that has gone on by its licensees." (Sic.)

27. The licensing agreements brought plaintiff revenues and maintained the quality of the product distributed under its housemark by other bottlers, since plaintiff

took great care when selecting its licensees.

28. Regardless of these agreements, plaintiff itself, between mid-February and late March 1985, shipped to Baltimore approximately 8,600 cases of diet chocolate fudge soda which were distributed up to 250 miles outside of Baltimore. Plaintiff also shipped approximately 11,000 cases to the Pittsburgh area between mid-March and late April 1985 and 200 cases to the "New York—Philadelphia—Baltimore" area in March or April 1985.

29. Plaintiff's diet chocolate fudge soda was not sold to consumers in defendant's market until some time after mid-February 1985. Prior to this time, plaintiff's products were seen rarely, if at all in defendant's market area.

30. Plaintiff granted a license to the Hamblet Advertising Agency and/or the 7-Up Bottling Company of Philadelphia covering a portion of defendant's market area. Distribution of the plaintiff's diet chocolate fudge product under that agreement did not begin until late May 1985. The licensee under this arrangement had distribution rights in two to eight states, and initially sold 50,000 cases in just over one week.

31. Although the evidence as to the exact date defendant began selling its diet chocolate fudge soda is imprecise, defendant's sales under the housemark "Vintage" began between late April and late May 1985. As of October 1985 defendant had sold approximately 50,000 cases of its product.

32. Both plaintiff's and defendant's diet chocolate fudge soda products contain carbonated water, artificial chocolate flavor and color, potassium benzoate and malic acid. Neither product contains sugar, milk, chocolate or butter, the ingredients with which chocolate fudge candy is generally made.

33. Both plaintiff's and defendant's product do, however, have a rich chocolate taste and aroma although they taste different.

34. Plaintiff's spring 1985 application (Serial No. 73/529296) for protection of the designation "chocolate fudge" under the Lanham Act was rejected as merely descriptive by an examining attorney at the U.S. Patent and Trademark Office on May 23, 1985.

35. In late August—early September 1985, plaintiff conducted a telephone survey in the Chicago area for the purpose of determining whether "chocolate fudge" had acquired a secondary meaning.

36. No survey however, has been presented to demonstrate whether "chocolate fudge" has established in defendant's market a secondary meaning as to the origin of plaintiff's product.

37. Alan Canfield stated that he did not know whether such a survey conducted in defendant's market would show that consumers associate "chocolate fudge" with plaintiff.

38. On July 8, 1985, after a hearing on a preliminary injunction, Judge Shadur of the U.S. District Court for the Northern District of Illinois concluded that there was a reasonable basis for holding that "chocolate fudge" as used by plaintiff is suggestive, but that if not, there was as to the Chicago area, "a substantial likelihood Canfield's will be able to show chocolate fudge, as the result of thirteen years of use and advertising and with the enormous springboard presented by the Greene article and the ensuing nationwide publicity and skyrocketing demand, has obtained the requisite secondary meaning to entitle Canfield to trademark protection." *A.J. Canfield Co. v. Vess Beverages, Inc.*, 226 U.S.P.Q. (BNA) 811, 818, 612 F.Supp. 1081 (N.D.Ill. 1985).

39. On July 10, 1985, plaintiff sent to defendant a cease and desist letter and a copy of Judge Shadur's opinion.

40. Plaintiff's diet chocolate fudge soda evolved at the request of Alan Canfield, who approximately 15 years ago, presented plaintiff's chemist with some chocolate fudge candy and asked him to duplicate the flavor for use in a carbonated drink.

41. The Carnation Company uses "chocolate fudge" nationally as a flavor designator for its "Slender" diet chocolate fudge drink. Carnation has sold "Slender" since 1970.

42. Plaintiff has used photographs of chocolate fudge in its advertising and on labels applied to its diet chocolate fudge soda can.

43. Alan Canfield confirmed the use of pictures of chocolate fudge, as well as the use of pictures of chocolate cake and chocolate candy in plaintiff's diet chocolate fudge soda advertisements.

44. Other advertisements of plaintiff's product liken it to a cold hot fudge sundae.

45. Still other advertisements by plaintiff use "diet chocolate fudge" in a manner that characterizes the designation as a flavor. For example, the text of a radio commercial informs consumers that with diet chocolate fudge "(a)ll you get is this heavenly, chocolate-rich Canfield's flavor." The audio portion of a television commercial urges consumers to:

> [wake] up to the wonderful world of Canfield's nine delicious flavors that don't fudge on flavor ... even in Canfield's Diet Chocolate Fudge Soda ... so chocolately-rich it tastes like a cold hot fudge sundae!
> ... So get free from a one flavor world of diet drinks.

46. Many products, such as puddings, pie fillings, cakes and cake mixes, frostings, brownies, cookies, "pop-tarts," ice cream, ice cream toppings and frozen dairy products are designated and have inscribed on their packaging the words "chocolate fudge".

47. Numerous chocolate flavored soft drinks, either naturally or artificially flavored, are sold throughout the United States.

48. Although trade dress has not been challenged here, the trade dress of plaintiff's and defendant's cans are similar. There is however, a high degree of uniform packaging and marketing in the soft drink industry. For example, white is associated with diet drinks and brown with chocolate drinks.

49. The only evidence of actual confusion presented was testimony by plaintiff's vice president that during a recent airplane trip, a fellow passenger recounted how he had mistakenly bought defendant's diet chocolate fudge soda thinking it was plaintiff's product.

## II. CONCLUSIONS OF LAW

### A. *Preliminary Injunction*

1. The court has jurisdiction over this matter pursuant to 15 U.S.C. § 1121 (1985 Supp.), 28 U.S.C. § 1338 (1976) and 28 U.S.C. § 1332 (1985 Supp.).

2. To obtain a preliminary injunction, the moving party must show a reasonable likelihood of eventual success in the litigation, and that irreparable injury will ensue if relief is not granted. In addition, the court may consider the possibility of harm to other interested persons from the grant or denial of relief, and the overall public interest. *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 150–51 (3d Cir.1984); *Kennecott Corp. v. Smith,* 637 F.2d 181, 187 (3d Cir.1980).

3. The applicant for preliminary relief bears the burden of establishing each element. *A.O. Smith Corp. v. Federal Trade Commission,* 530 F.2d 515, 525 (3d Cir. 1976).

### B. *Likelihood of Success on the Merits*

#### (1) *Relationship Between Federal and Common Law Unfair Competition*

4. The complaint states two causes of action, one brought under the law of "federal unfair competition," the other under the "common law of unfair competition."

5. The federal cause of action is grounded in § 43(a) of the Lanham Act, the national trademark statute, as codified at 15 U.S.C. § 1125(a) (1982). The thrust of plaintiff's statutory claim is that defendant's use of the mark "chocolate fudge" in connection with its diet chocolate soda constitutes a false designation of origin and a

false description or representation. Plaintiff alleges that consumers will be confused into believing that defendant's product is plaintiff's, or that plaintiff is otherwise associated with defendant's product.[1]

6. The common law cause of action is less clear[2] since plaintiff has simply incorporated by reference under this count all the allegations supporting its federal claim, and has failed to pursue this claim as a separate cause of action, either in its briefs or at oral argument. Nonetheless, the identity of standards under the common and federal law, in the absence of any suggestion by plaintiff to the contrary, *see Black & Decker Manufacturing Co. v. Ever-Ready Appliance Manufacturing Co.*, 518 F.Supp. 607, 617 (E.D.Mo.1981), *aff'd* 684 F.2d 546 (8th Cir.1982), simplifies the analysis. *See American Footwear Corp. v. General Footwear Co., Ltd.*, 609 F.2d 655, 664 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Blake Publishing Corp. v. O'Quinn Studios, Inc.*, 202 U.S.P.Q. (BNA) 848, 852 (S.D.N.Y.1979); *Franklin Mint, Inc. v. Franklin Mint, Limited*, 331 F.Supp. 827, 831 (E.D.Pa.1971); *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.*, 267 F.Supp. 963, 974 (W.D. Pa.1967), *aff'd*, 395 F.2d 457 (3d Cir.1968), *cert. denied*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968); *Villager, Inc. v. Dial Shoe Co., Inc.*, 256 F.Supp. 694, 702–03 (E.D.Pa.1966); *cf. John Wright, Inc. v.*

*Casper Corp.*, 419 F.Supp. 292, 325 (E.D. Pa.1976) (where the § 43(a) claim involves imitation of plaintiff's trade name ... federal law tracks classic principles of state law unfair competition), *aff'd in part, rev'd in part on other grounds sub nom. Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir.1978).

### (2) *The Lanham Act*

7. In the present case plaintiff seeks to restrain defendant from using the non-registered designation "chocolate fudge."

8. It is well-established that such relief is available under § 43(a), which extends protection to non-registered trademarks. *E.g., SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065 (3d Cir.1980), citing with approval *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir.1954); *Ames Publishing Co. v. Walker-Davis Publications*, 372 F.Supp. 1, 11 (E.D.Pa.1974).

9. The purpose of the Lanham Act is to "protect the public from the confusion and deception which flows from the copying of marks which, through their distinctiveness or exclusivity of use, identify the origin of the marked products." *W.E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868, 871 (2d Cir. 1966). *See Superior Models, Inc. v. Tolkien Enterprises*, 211 U.S.P.Q. (BNA) 587, 590, *modified on other grounds*, 211 U.S. P.Q. (BNA) 876 (D.Del.1981). "The trademark laws exist not to 'protect' trade-

---

1. Section 43(a) prohibits the false designation of origin and any other false description or representation:

> Any person who shall ... use in connection with any foods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

2. The plethora of claims brought under § 43(a) and other similar theories often results in a

muddled use of terms to describe the various causes of action. Claims such as plaintiff's § 43(a) false designation of origin are often referred to as federal unfair competition claims. These federal actions are distinct from common law unfair competition claims, which are creatures of state law. *See International Order of Job's Daughters v. Lindeburg and Co.*, 633 F.2d 912, 915–16 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981); *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3, 14–15 (5th Cir. 1974); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n. 1 (2d Cir.1956). *See, e.g., Loctite Corp. v. National Starch and Chemical Corp.*, 516 F.Supp. 190 (S.D.N.Y.1981), wherein the court carefully set out and individually treated the various federal and common law claims.

marks, but ... to protect the consuming public ..., concomitantly protecting the trademark owner's right to a non-confused public." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir. 1978) (citation omitted).

### (a) *Descriptive Versus Suggestive*

10. Prior to determining the existence, or likelihood, of consumer confusion, I must determine whether plaintiff may protect its designation, since, as a matter of policy, not all designations may receive trademark protection. *See* 1 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 1, (1984) ("McCarthy"); *American Diabetes Association, Inc. v. National Diabetes Association*, 533 F.Supp. 16, 19 (E.D.Pa.1981), *aff'd mem.*, 681 F.2d 804 (3d. Cir.1982); *Merritt Forbes & Co., Inc. v. Newman Investment Securities, Inc.*, 604 F.Supp. 943, 953 (S.D.N.Y.1985); *L.F. Gaubert & Co., Inc. v. Institute of Electrical and Electronics Engineers, Inc.*, 563 F.Supp. 122, 127 (E.D.La.1983); *Blake Publishing, supra*, 202 U.S.P.Q. (BNA) at 852; 1 McCarthy, *supra* at § 15:1 (to establish trademark infringement or unfair competition, the law first requires proof of validity: "[t]hat the public recognizes plaintiff's symbol as identifying his goods or services and distinguishing them from those of others"); Bauer, "A Federal Law of Unfair Competition: What Should Be the Reach of Section 43(a) of the Lanham Act?" 31 U.C. L.A.L.Rev. 671, 697 and case cites at 697 n. 122 (1984) ("Bauer"); *cf. Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); *Discount Muffler Shop, Inc. v. Meineke Realty Corp., Inc.*, 535 F.Supp. 439, 444 (N.D.Ohio 1982) (both noting that the threshold question in a tradename infringement action is whether the word or phrase is registrable or protectable); *W.E. Bassett Co. v. Revlon, Inc., supra* 354 F.2d at 871 (in an action claiming infringement of a registered

trademark, the court must evaluate "the likelihood that the plaintiff's mark is valid, is worthy of protection").

■ If "chocolate fudge" is likely to be protectable, then plaintiff is entitled to an injunction if it demonstrates that defendant's continued use of the mark will likely cause confusion as to the source of the goods. *American Diabetes Association, supra* 533 F.Supp. at 19–20. If "chocolate fudge" is not likely to be protectable, then plaintiff is not entitled to an injunction.

11. Under common law and the Lanham Act, a designation will fit within the following classifications: (1) generic or common descriptive; (2) merely descriptive; (3) suggestive, and (4) arbitrary or fanciful. *Id.* at 19, citing *Miller Brewing Co. v. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978).[3]

12. A generic term, used to denote the genus of goods or services, cannot become a trademark under any circumstances because appropriation of such generally descriptive terms would grant the owner of the mark a monopoly and prevent competitors from adequately describing their goods or services. *American Diabetes Association, supra* 533 F.Supp. at 19.

13. A merely descriptive term, which specifically describes a characteristic of the goods, can only achieve protectable status as a valid trademark if it acquires customer recognition and secondary meaning. *Id.* *See* 1 McCarthy, *supra* at §§ 11:5–11:8.

14. Suggestive and fanciful terms, inherently distinctive because they are removed from mere descriptions of the goods, may be protected even without proof of secondary meaning. *American Diabetes Association, supra* 533 F.Supp. at 19. *See* 1 McCarthy, *supra* at §§ 11:2–11:4.

---

**3.** The four classifications are arranged along a spectrum of distinctiveness, from least to most distinctive. Distinctiveness is the hallmark of trademark protectability. The more distinctive

a mark, the less the need to present evidence of secondary meaning in order to preclude others from using it. *See* McCarthy, *supra* at § 11:1.

15. I conclude, and neither party argues to the contrary, that "chocolate fudge" is not fanciful or arbitrary.

16. I also conclude that "chocolate fudge" as applied to diet chocolate soda is not generic. There is no proof that the term has come to be understood as referring to the genus of all chocolate-flavored diet sodas. *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

17. Whether "chocolate fudge" is suggestive or merely descriptive however, is the crucial question.

18. Relying on the well-established suggestive—descriptive distinction formulated in *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 295 F.Supp. 479 (S.D.N.Y.1968) and cited by Judge Shadur in *Vess,* plaintiff argues that "chocolate fudge" is suggestive. Defendant counters that "chocolate fudge" describes a flavor, and therefore is not protectable in the absence of secondary meaning.

19. The test for determining whether a designation is suggestive or descriptive is as follows:

A term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Stix, supra* 295 F.Supp. at 488.

20. The "descriptive-suggestive borderline is hardly a clear one." 1 McCarthy, *supra* at § 11:21. Nonetheless, I am unpersuaded by plaintiff's argument that "chocolate fudge," even as applied to diet soda, is suggestive.

21. Although I recognize that plaintiff's product lacks the ingredients of chocolate fudge candy, I conclude that "chocolate fudge" immediately conjures up the deep, rich chocolate flavor and aroma that plaintiff not only sought in creating its soda product, but advertises as one of its most attractive features. *See Philip Morris, Inc. v. R.J. Reynolds Tobacco Co.,* 188 U.S.P.Q. (BNA) 289, 292 (S.D.N.Y.1975).

*See also Educational Development Corp. v. Economy Co.,* 562 F.2d 26, 29 (10th Cir.1977) ("A mark to be merely descriptive need not directly convey all of a product's characteristics, uses or functions but need only impart directly a crucial, important aspect of the product."); 1 McCarthy, *supra* at § 11:6 ("[A] term [that] gives some reasonably accurate or tolerably distinct knowledge of the characteristics of a product ... is descriptive as trademark law defines 'descriptive.' " citing *Blisscraft of Hollywood v. United Plastics,* 294 F.2d 694 (2d Cir.1961); *Robert Bruce, Inc. v. Sears Roebuck & Co.,* 343 F.Supp. 1333 (E.D.Pa. 1972)). This immediate association is the quintessence of descriptiveness.

22. Because "chocolate fudge" meets the descriptive test, it therefore fails the suggestive test. As a corollary to the immediacy with which a consumer understands the crucial characteristics of a product upon perceiving its mark, it is clear that the consumer needs little imagination or thought to arrive at the *nature* of plaintiff's goods. Upon perceiving the mark, and without any imagination, for example, the consumer quickly recognizes that the product has a particular taste, a deep chocolate taste, and not a vanilla or strawberry taste. *See Loctite Corp., supra* 516 F.Supp. at 201 (noting that "Super Glue," if not generic, is descriptive of cyanoacrylate adhesive because it "has conveyed to the relevant public 'an immediate idea of the ingredients, qualities or characteristics of' cyanoacrylate adhesive, namely that it is a glue of exceptional properties, in terms of strength and/or speed of setting" (citations omitted)); *compare Stix, supra* 295 F.Supp. at 488. ("Contact" held not to "convey to one unfamiliar with self-adhesive decorating plastics the quality of self-adhesion" of the product.)

23. Even under other suggestive-descriptive tests set forth by Professor McCarthy's recommended series of inquiries, plaintiff's argument for suggestiveness is not compelling. *See* 1 McCarthy, *supra* at § 11:22. For example, plaintiff's mark so closely tells something about

the product that other sellers of like products are likely to want to use the term in connection with their goods. In fact, other producers have used the designation to describe their soft drink products. Furthermore, buyers are at least as likely to regard the mark as another form of self-laudatory advertising as they are to identify it as a symbol of origin.

24. Moreover, as in *Loctite Corp., supra* 516 F.Supp. at 202, there are numerous other public usages of the designation, albeit on products outside the soft drink industry, *e.g.,* Carnation's diet drink and various ice cream and dessert products. This indicates that "chocolate fudge" has been generally understood as describing the flavor of the product.

25. That chocolate fudge is merely descriptive of a flavor is supported by the analysis set forth in *In re Andes Candies, Inc.,* 478 F.2d 1264 (C.C.P.A.1973). There the applicant/appellant sought to protect the designation "creme de menthe" for its laminated chocolate mint candy squares that contained no creme de menthe liqueur. The court noted that the issue was not whether the mark "is merely descriptive of the product, which it is not, but whether it so describes its flavor." *Id.* at 1266. It affirmed the Trademark Trial and Appeal Board's denial of protection, and concluded that "candy manufacturers have a right to employ 'creme de menthe' precisely as appellant [did], *i.e.,* to designate a flavor similar to the liqueur." *Id.* at 1267. In reaching this holding, the court focused on the association consumers make between the name and nature of the product:

> We think the only possible reaction of purchasers, upon being presented with CREME DE MENTHE chocolate wafers, is the expectation that the wafers will have a mint taste something like that of creme de menthe liqueur. Surely, the purchasers would not expect to find a

cherry or rum or butterscotch flavor in the candies. Whether or not the public is aware of the dictionary definition of "creme de menthe" ... ("a relatively sweet green or white liqueur flavored with various mints, principally peppermint"), the words clearly connote a mint flavored liqueur. Of course the purchaser knows the product is a candy, not a liqueur, but, as appellant admits, the average purchaser would "expect the candy to have a flavor similar" to that of creme de menthe liqueur.

*Id.* at 1266–67. The same assumptions as to consumer/product associations are no less certain in the soft drink market, especially where there is evidence that plaintiff advertised chocolate fudge as one of its *flavors.*

26. Although the court in *Andes Candies* construed § 2(e)(1) of the Lanham Act, 15 U.S.C. § 1052(e)(1) (1976),[4] not § 43(a) at issue here, I find the case persuasive for three reasons. First, the same *Stix* test for descriptiveness applied in this § 43(a) case is also used in construing the "merely descriptive" language of § 2(e)(1). *E.g., In Re Bright-Crest, Ltd.,* 204 U.S.P.Q. (BNA) 591, 593 (T.T.A.B.1979). Second, the *Stix* court after applying the test for descriptiveness, drew support for its conclusion by citing § 2(e)(1). *See Stix,* 295 F.Supp. at 488 (text accompanying n. 31). Third, both sections have the same goal, consistent with the purpose of the Lanham Act, of protecting those marks that are source-specific.

#### (b) *Secondary Meaning*

27. Even if "chocolate fudge" is held to be merely descriptive, plaintiff argues that its designation should nonetheless be protected because chocolate fudge has acquired secondary meaning, thereby becoming a common law trademark.

\*    \*    \*    \*    \*    \*

4. 15 U.S.C. § 1052 provides that:
No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

(e) Consists of a mark which, (1) when applied to the goods of the applicant is merely descriptive or deceptively misdescriptive of them ....

28. Defendant, relying on *Natural Footwear, Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383 (3d Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985), argues that if plaintiff's designation has achieved secondary meaning, it has done so only in the Chicago area, and that any protection afforded plaintiff's common law trademark in that market should not be extended absent proof of plaintiff's market penetration. I agree.

29. Secondary meaning is the vehicle by which designations that are not in the first instance distinctive may gain distinctiveness and thereby protection under the trademark laws. *See Armstrong Paint & Varnish Works v. Nu-Enamel Corp.,* 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195 (1938). It "is the magic wand of consumer recognition which may transform even the most common and descriptive term into a well-known and 'strong' mark entitled to all the protection" of the trademark laws. 1 McCarthy *supra* at § 15:2(c).

30. As the Third Circuit has indicated,

> Secondary meaning exists when the trademark [or designation] is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin. Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source. Once a trademark [or designation] which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark.

*Scott Paper Co., supra* 589 F.2d at 1228 (citations omitted).

31. The existence of secondary meaning depends on the facts of each case, *W.E. Bassett Co., supra* 354 F.2d at 871, and the burden of proof rests upon the plaintiff. *President and Trustees of Colby College v. Colby College-New Hampshire,* 508 F.2d 804, 807 (1st Cir.1975).

32. Secondary meaning cannot exist in a market that plaintiff has not penetrated, *Natural Footwear, supra* 760 F.2d at 1403 n. 47, by the time defendant begins its use of the mark in question. *See Scott Paper Co., supra* 589 F.2d at 1231.

33. In *Natural Footwear,* the court set forth the rationale behind this conclusion when it explained the general requirement that common law trademark holders must penetrate the market in question in order to enjoy protection:

> In the venerable case of *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403 [, 36 S.Ct. 357, 60 L.Ed. 713] (1916) [parallel citations omitted], the Supreme Court laid down the basic principles governing the territorial rights of trademark holders under the common law. The Court held that the trademark of a prior user should be protected from infringement by a subsequent user of the same mark only in areas where the prior user has established a market for its goods:
>
>> Since it is the trade, and not the mark that is to be protected, a trademark acknowledges no territorial boundaries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article.
>
> *Id.* at 417 [*Sic;* at 416 (36 S.Ct. at 361) ]. Thus, the senior user of a common law mark may not be able to obtain relief against the junior user in an area where it has no established trade, and hence no good will.

*Id.* at 1394. Based on this rationale, the court reversed a trial court holding that Roots, a New Jersey clothing store and senior user of the designation "Roots" had national common law rights to the designation as against Natural Footwear, a junior, but federally registered user of the same designation. Noting four indicia of market

penetration, the court ruled that senior user Roots did not have the requisite national market penetration at the time the junior user began selling to the market in question. An analysis of the senior user Canfield's penetration of defendant's Pennsylvania, New Jersey and New York state market area yields a parallel result.

34. The first indicia of market penetration, volume of sales of the product sought to be protected, is difficult to evaluate here, because I, like the *Natural Footwear* court, have been presented with lean evidence. Although there was proof that approximately 8,600 cases of plaintiff's product were distributed within a 250 mile radius of Baltimore in late winter 1985, that 200 additional cases of plaintiff's product were shipped to the New York—Philadelphia-Baltimore area in March or April 1985, and that plaintiff's licensee sold 50,000 cases in its two-to-eight state licensing area at about the time defendant began selling its product, I have not been given sufficient proof and cannot extrapolate with any degree of certainty, the amount of plaintiff's product that was sold in the subject market. Market penetration cannot be measured upon the imprecise statistics set forth by plaintiff, especially when it bears the ultimate burden of proof. *See Natural Footwear, supra* 760 F.2d at 1399.

35. Similarly, the other indicia of market penetration have not been sufficiently established by plaintiff. As to the "growth trends (both positive and negative) in the area," it is possible that plaintiff's product has experienced or will experience specifically in defendant's market the same exponential growth that occurred following the Bob Greene column. However, given the instability of the soda market, I cannot conclude that there is a positive growth trend in defendant's market for plaintiff's product.

36. Nor is there sufficient evidence as to the other market penetration factors. Plaintiff has failed to introduce any testimony on the percentage of possible customers in the subject area actually purchasing its product. Finally, the amount of product

advertising in the area has not been sufficiently set forth. Although plaintiff granted advertising allowances to its licensees and supplied them with advertising materials, plaintiff conceded it had "no knowledge of the advertising or promotion that has gone on by its licensees." (Sic.) Furthermore, the evidence as to plaintiff itself having advertised the product in defendant's market is sketchy, even when unsolicited print and broadcast publicity are taken into account.

37. Plaintiff counters that even absent market penetration, an injunction should lie because "the acquisition of secondary meaning in plaintiff's primary market is sufficient to prevent defendants from intentionally adopting the same or similar mark." Although I have found that defendant intentionally adopted the chocolate fudge mark, I am not persuaded that such copying of a non-protectable mark is likely actionable under the trademark law, even assuming that plaintiff has established secondary meaning in its primary market.

#### (c) *Secondary Meaning in the Making*

38. Plaintiff asserts two arguments for its theory of geographically expanded secondary meaning absent proven market penetration. One, based on § 43(a) cases from the Southern District of New York, urges adoption of the "secondary meaning in the making" doctrine. This "posits that a firm which is making efforts to create a secondary meaning, but has not yet succeeded, should be protected as against a competitor who knowingly rushes in to market a product under a similar mark." 1 McCarthy, *supra* at § 15:21.

39. The cases upon which plaintiff grounds its argument however, are unpersuasive. In all of them the district court's endorsement of "secondary meaning in the making" constituted dicta, given initial findings in each instance of secondary meaning. *See, e.g., Orion Pictures Co., Inc. v. Dell Publishing Co., Inc.,* 471

F.Supp. 392 (S.D.N.Y.1979); *Blake Publishing Corp., supra* 202 U.S.P.Q. (BNA) 848; *National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 376 F.Supp. 733 (S.D.N.Y.), *aff'd* 497 F.2d 1343 (2d Cir. 1974);[5] *cf. Black & Decker Manufacturing Co. v. Ever-Ready Appliance Manufacturing Co., supra* 518 F.Supp. at 616, ("[C]lear weight of authority is that a showing of [actual] secondary meaning is necessary to prevail under § 43(a);" court refuses to adopt New York dicta); *Superior Models, Inc. v. Tolkien Enterprises, supra* 211 U.S.P.Q. (BNA) at 593–594 (Delaware court, though citing no Third Circuit support for even evaluating the existence of "secondary meaning in the making," finds New York cases inapposite.)

40. Moreover, the mere notion of "secondary meaning in the making" is inimical to the purpose of the doctrine of secondary meaning, which is to protect designations once they are indicative of a product's origin. *See* 1 McCarthy, *supra* § 15:21. Sanctioning the exclusive use of a designation even before it is associated with the origin of the product undercuts the premium placed by the Lanham Act on distinctiveness, and robs manufacturers of terms that may be necessary to market their products, thereby restricting competition.

### (d) *Defendant's Intentional Copying as Bad Faith*

41. The second basis of plaintiff's claim for expanded geographical use in the ab-

sence of market penetration and resultant secondary meaning is derived from the characterization of defendant's copying as bad faith. Plaintiff asserts that "[d]efendant did not adopt Chocolate Fudge in good faith and, therefore, cannot profit from plaintiff's lack of secondary meaning in an area where defendants claim prior use." This argument is unpersuasive for two reasons.

■ First, intentional copying is not a substitute for secondary meaning under § 43(a); *see Philip Morris, Inc., supra* 188 U.S.P.Q. (BNA) at 293; *see also Brooks Shoe Manufacturing Co., Inc. v. Suave Show Corp.,* 716 F.2d 854, 859 (11th Cir. 1983) (trade dress infringement claim); *Bauer, supra* 31 U.C.L.A.L.Rev. at 699–700; *cf. Devcon Corp. v. Woodhill Chemical Sales Corp.,* 455 F.2d 830, 833 (1st Cir.) (supplemental opinion) (intentional copying of a descriptive phrase does not raise a presumption that the phrase had acquired secondary meaning), *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972); *Superior Models, Inc. v. Tolkien Enterprises, supra* 211 U.S.P.Q. (BNA) at 878, 594; *Astatic Corp. v. American Electronics, Inc.,* 201 U.S.P.Q. (BNA) 411, 421 (N.D. Ohio 1979); 1 McCarthy, *supra* at § 15:5; *contra Travelodge Corp. v. Siragusa,* 228 F.Supp. 238, 241 (N.D.Ala.1964).

■ Second, even under the common law Tea Rose-Rectanus doctrine,[6] I am not convinced that defendant's copying of the

5. Not even the Second Circuit's affirmance in *National Lampoon* amounted to an endorsement of "secondary meaning in the making," since that court based its decision upon the trial court's finding secondary meaning. *See Loctite Corp. v. National Starch and Chemical Corp., supra* 516 F.Supp. at 211.

6. Plaintiff characterizes the doctrine as establishing that "the only factual situations where a senior user cannot prevent use of the same or similar mark by another geographically remote user, who has used the mark first in said remote trade area, is namely when the mark is adopted by the junior user in good faith without prior knowledge of the senior user's use."

Like Professor McCarthy, I give the doctrine a narrower construction, and view it as providing that

under common law, absent appropriate federal legislation, the national senior user of a mark cannot oust a geographically remote good-faith user who has used the mark first in a remote trade area. When the national senior user tries to enter the remote area, its rights must give way to the rights built up in good faith by a local user.

2 McCarthy, *supra* at § 26:1. "The rationale [of the Tea Rose-Rectanus doctrine] is clear: in the absence of any federal legislation giving nationwide rights, the senior user cannot pre-empt remote geographical markets before it actually

designation "chocolate fudge"[7] rises to the level of bad faith demonstrated in the cases cited by plaintiff. Defendant's actions fall short of the conduct by junior user Johanna Farms, Inc.'s president, who bid for, and lost what he recognized to be the protectable strong mark "pure maid." *See Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866 (E.D.N.Y.1978). Similarly, strong designations in *Hanover Milling Co. v. Metcalf,* 240 U.S. 403 (1916) (No. 23) ("Tea Rose" found to have secondary meaning in the market at issue) and *Travelodge v. Siragusa, supra* 228 F.Supp. 238 ("Travelodge" is registered servicemark) distinguish the other two cases on which plaintiff primarily relies. Plaintiff's remaining cases are likewise distinguishable because of the strength of the marks at issue and/or because of the high level of defendant's bad faith. Neither do I find persuasive in considering this common law theory plaintiff's reference to the statutory defense set forth in 15 U.S.C. § 1115(b)(5).

██ 42. Finally with respect to plaintiff's likelihood of success on the merits, even if plaintiff had proved secondary meaning, or pursued the common law unfair competition claim, it would still need to demonstrate the likelihood of source confusion between its product and defendant's in order to gain relief under either § 43(a), *see Freixenet, S.A., supra,* 731 F.2d at 151 or under the common law, *see Surgical Supply Service, Inc. v. Adler,* 321 F.2d 536, 539 (3d Cir.1963) (invoking Pennsylvania tort law); *see also Scott Paper Co., supra* 589 F.2d at 1228; *Sears, Roebuck & Co. v. Johnson,* 219 F.2d 590 (3d Cir.1955); *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.,* 414 F.Supp. 1003, 1013 (E.D.Pa.1976). Such confusion need not be actual, only likely. *Chips 'N Twigs, Inc., supra* at 1013; *Ames Publishing Co., supra* 372 F.Supp. at 12, citing *Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 649 (3d Cir.1958). Furthermore, the confusion need not extend to all consumers, just to

ordinary members of the product-buying public. *American Diabetes Association, supra* 533 F.Supp. at 21; *Scott v. Mego International, Inc.,* 519 F.Supp. 1118, 1133 n. 17 (D.Minn.1981); *General Pool Corp. v. Hallmark Pool Corp.,* 259 F.Supp. 383, 386 (N.D.Ill.1966) and cases cited therein.

██ With respect to trade dress and packaging, " 'The import of confusion is that the consumer must have something in mind, even though vague, with which to confuse another product.' " 1 McCarthy, *supra* at § 8:2 (citations omitted). Although plaintiff presented evidence of national publicity with respect to its product, as well as advertising, sales, and licensing agreements made within defendant's market area, that evidence is not sufficient to show likelihood of market penetration and concomitant likelihood of mark recognition, particularly given the high degree of uniform packaging and marketing in the soft drink industry. Except for the anecdote from the airplane trip, plaintiff presented no direct evidence of confusion or likelihood of confusion. Neither am I persuaded that the additional consideration of defendant's intentional copying establishes likelihood of confusion. Therefore, I hold that plaintiff has not met its burden of demonstrating that the appropriate consumers in defendant's market, upon perceiving defendant's mark, have or are likely to have in mind, that something with which to confuse plaintiff's and defendant's products. *See L.F. Gaubert, supra* 563 F.Supp. at 128 (and cases cited therein).

### C. *Other Preliminary Injunction Factors*

██ 43. Having determined that plaintiff's mark is descriptive and unlikely to be found protectable, since plaintiff has failed to show likelihood of penetrating the relevant market, and that, in any event, there is insufficient proof on the question of con-

---

enters them either by advertising, reputation, or actual sales." *Id.*

7. Any evidence that defendant intentionally copied plaintiff's trade dress is mitigated by the uniformity of packaging in the soft drink industry.

fusion, I need not reach the other preliminary injunction factors, and must deny the request for preliminary injunctive relief. *Freixenet, S.A., supra* 731 F.2d at 152.